## NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2019 CJ 1023

### STATE OF LOUISIANA, IN THE INTEREST OF L.P.

*PMc by JEW*
*JEW*

**Judgment Rendered:**   JUL 0 8 2020

* * * * * *

On Appeal from the Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket No. 9681 JJ

Honorable Scott Gardner, Judge Presiding

* * * * * *

| | |
|---|---|
| Betsy Humphries Smith<br>MHAS/Child Advocacy Program<br>Mandeville, Louisiana | Counsel for Appellee<br>The Minor Child L.P. |
| Whitney Germany<br>Assistant District Attorney<br>Covington, Louisiana | Counsel for Appellee<br>State of Louisiana |
| M. J.<br>Slidell, Louisiana | Defendant/Appellant<br>(Father of minor child)<br>In Proper Person |
| Amber Sheppard<br>Slidell, Louisiana | Counsel for Intervenors/Appellees<br>D.P., L.A.P., J.P., and A.P. |
| Shannon C. Mese<br>Covington, Louisiana | Counsel for Defendant/Appellee<br>C.P. |

* * * * * *

BEFORE: McCLENDON, WELCH, AND HOLDRIDGE, JJ.

Holdridge J. dissents for reasons assigned

**McCLENDON, J.**

Father, M.J., appeals a judgment maintaining his minor daughter's visitation with her maternal relatives, ordering M.J. to have no contact with maternal relatives outside of Our Family Wizard, ordering M.J. to have no contact with counsel for maternal relatives or counsel for the child, and finding M.J. in contempt and issuing penalties in connection therewith. M.J. also seeks this court's review of procedural issues, including the trial court's denial of his exception of improper use of summary proceedings, the trial court's maintenance of the custody issues through Child in Need of Care ("CINC") proceedings, and the trial court's maintenance of counsel for the child throughout the proceedings. Having thoroughly reviewed the entirety of the record before us, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

L.P.[1] was born to C.P. on November 9, 2016. L.P. was taken into the custody of the Department of Child and Family Services ("DCFS") on December 13, 2016, and placed with her maternal grandparents, D.P. and L.A.P., and her maternal aunt and uncle, J.P. and A.P. (sometimes collectively, "maternal relatives") for care. L.P. was adjudicated a Child in Need of Care on February 22, 2017, and continued in the care of her maternal relatives thereafter.

The man initially alleged to be L.P.'s biological father during the CINC proceedings was later excluded from paternity by DNA test results. Accordingly, he was removed from the case. DNA test results then identified M.J., appellant herein, as L.P.'s biological father, and M.J. began unsupervised weekend visitation with L.P., then nine months old.

On August 31, 2017, counsel for L.P. filed a Motion for Special Review regarding the recently instituted unsupervised weekend visitation. Counsel for L.P. asserted that DCFS had not informed her that M.J. had been identified, or that M.J. would begin visitation with L.P. Counsel for L.P. expressed concern that the visitation schedule did not represent a gradual increase in time spent with M.J., as is generally recommended

---

[1] To ensure the confidentiality of the child, all parties shall be referred to by their initials. See Uniform Rules-Courts of Appeal, Rules 5-1 and 5-2.

2

for young children. Further, the unsupervised weekend visitation did not comply with the case plan, which provided for hourly supervised visits at the DCFS office. M.J. also had not yet completed the required parenting instruction. Moreover, L.P. had returned from her first weekend visit with M.J. with a large bruise near her eye, raising concerns for L.P.'s safety. The maternal relatives submitted photographs documenting the bruise. Maintaining that L.P. "now identifies her foster parents as her psychological parents and has a significant attachment to them," counsel for L.P. sought the trial court's intervention in the permanent placement plan going forward.

At an October 11, 2017 hearing, M.J. and the maternal relatives stipulated to a visitation schedule. L.P. would reside with M.J. The maternal relatives would enjoy visitation with L.P. during the first and third weekends of each month. The parties also stipulated to the closure of the case. C.P. was incarcerated at that time. Accordingly, counsel for L.P. definitively stated that "the first and third weekends of each month will be designated time with the mother's family," and "then upon the mother's release, we would just request that it be supervised by the... maternal family." M.J., C.P., and the maternal relatives were present for the hearing. The trial court accepted the updated and modified case plan ("October 11, 2017 stipulations"). The trial court explicitly retained jurisdiction for any necessary modifications.

On October 24, 2017, counsel for L.P. filed a Motion for Contempt and Modification of Visitation on the basis that M.J. was refusing to allow L.P.'s visitation with her maternal relatives in keeping with the October 11, 2017 stipulations. The Motion for Contempt was heard on October 31, 2017. The maternal relatives testified that M.J. and his fiancé had communicated to them that M.J. would not permit L.P.'s visitation with her maternal relatives unless L.P. was being taken to visit C.P. in prison, which the maternal relatives were unable to do at that time because the prison's required paperwork had not yet been completed.

Following the maternal relatives' testimony, M.J. expressed dissatisfaction with his counsel and asked the trial court to postpone the hearing so he could retain other counsel. The trial court declined to postpone the hearing and held a conference in chambers on the record. The trial court recognized that M.J. had "totally obstructed"

3

the maternal relatives' visitation. However, the trial court denied the Motion for Contempt because there was no written judgment memorializing the October 11, 2017 stipulations. The trial court also denied the motion to modify custody given that the current plan had then been in place for less than a month. A weekend of visitation in favor of the maternal relatives was ordered to make up for the visitation they had been denied. The trial court instructed M.J.'s counsel to explain the court's recommendation to M.J.

When the hearing resumed, M.J. did not dispute the maternal relatives' testimony regarding his refusal to allow them visitation. Instead, M.J. insisted that "OCS, my attorney, and their attorneys told me to not transfer that child without that child going to see the mother" and that the trial court was "changing" the agreement.[2] The trial court reminded M.J. that M.J. had been present in the courtroom when the October 11, 2017 stipulations were read into the record. The trial court executed two written judgments on October 31, 2017, memorializing the October 11, 2017 stipulations and the October 31, 2017 hearing.

On January 23, 2018, counsel for L.P. filed a Motion for Contempt and Incidental Relief. The second Motion for Contempt alleged that M.J. refused to drive L.P. for drop-off or pick-up for visitation with her maternal relatives, that M.J. had created a strained and hostile environment at exchanges that was negatively affecting L.P., and that M.J. had again refused the maternal relatives' visitation with L.P. on several occasions. Counsel for L.P. requested that the trial court set a neutral location for drop-off and pick-up, order make-up visitation time in favor of the maternal relatives, and clarify the holiday and vacation schedule. A hearing was held on January 31, 2018. The trial court found M.J. in contempt upon finding that he had willfully disobeyed a court order, granted the maternal relatives a specific period of vacation time, and issued a Civil

---

[2] M.J. attempts to rely on the following exchange, which occurred after counsel for L.P. specified that the maternal relatives would have visitation the first and third weekend of each month during the October 11, 2017 hearing:

| Counsel for C.P.: | Just for my own clarification. So it's two weekends a month visitation with maternal kin. And then to include the Mom when she gets out? |
|---|---|
| The Court: | No. With Mom, but includes the maternal kin. Supervised by them. |

4

Warrant authorizing law enforcement to return L.P. to her maternal relatives for visitation as previously ordered.[3]

The trial court also executed an order permitting new counsel to enroll for M.J. on February 6, 2018. On behalf of M.J., his new counsel filed a Motion for Contempt with Request for Ex Parte Relief and Civil Warrant, and a Rule for Modification of Visitation. The pleadings alleged, in part, that the maternal relatives subjected L.P. to a "toxic environment where drugs are rampant and constant in the residence" and "viciously and systematically alienated [M.J.] and kept [L.P.] away from [M.J.] using psychological intimidation and repeatedly refusing to allow [M.J.] to see and communicate with [L.P.]."

On March 13, 2018, in response to M.J.'s Motion for Contempt raising allegations against them and accompanying Rule for Modification of Visitation, the maternal relatives filed a Motion for Intervention, as well as an Answer, Reconventional Demand, and Motion to Modify Disposition. The maternal relatives vigorously denied the allegations M.J. asserted against them and sought legal custody of L.P. The maternal relatives further requested that the trial court order that M.J. enjoy supervised visitation at their discretion, that M.J. undergo a mental health evaluation and any recommended treatment, and that M.J. attend and complete anger management classes. The maternal relatives also sought attorney's fees and costs for the defense of a frivolous suit.

M.J. voluntarily withdrew his Motion for Contempt, and its allegations regarding drugs, at a hearing on March 21, 2018. Although M.J. had executed a verification in connection with the Motion for Contempt, M.J. stated at the hearing that his counsel had mistakenly put that in the complaint. M.J. maintained his Rule for Modification, which was set for a hearing officer conference along with the other then-pending matters.

The hearing officer conference was held on April 10, 2018, and was documented in a conference report for submission to the trial court. The report noted M.J.'s claims that L.P.'s visitation with her maternal relatives was interfering with L.P.'s bonding with

---

[3] M.J. did not appear. M.J. contends that no proof of service appears in the record, and that service was requested on him personally rather than through his counsel, who had enrolled on January 4, 2018. The January 31, 2018 judgment was served on M.J. through his then counsel of record.

5

M.J. The report also reflected M.J.'s insistence that he was always cooperative with the maternal relatives and sought to facilitate their relationship with L.P. However, the hearing officer observed that M.J.'s demeanor towards the maternal relatives was aggressive and combative. The hearing officer opined that M.J. demonstrated "great animosity" to the maternal relatives and "was not hesitant to attack the maternal relatives even in front of the child or Court personnel." The report also detailed that M.J. repeatedly interrupted the conference, necessitating reprimands by the hearing officer and the bailiff on multiple occasions. Further, M.J. continued to insist he had initially been misled about the maternal relatives' visitation, despite the transcripts and judgments indicating otherwise. Moreover, although A.P. had previously quit her job to stay home and care for L.P., and was still willing to stay home and care for L.P., M.J. chose to send L.P. to daycare from 4:30 a.m. until 6:30 p.m. instead, which the hearing officer opined was not in L.P.'s best interest. Ultimately, the hearing officer recommended that the maternal relatives be granted joint custody of L.P. with M.J., that A.P. care for L.P. during the day when M.J. was at work, that C.P. continue visitation supervised by the maternal relatives, and that M.J. enroll in and complete an anger management program. The parties voluntarily stipulated that exchanges would occur at the Slidell Police Department.

All of the then-pending matters were heard by the trial court on May 16, 2018, at which time Brian Dragon enrolled as counsel of record for M.J. Mr. Dragon filed an Exception of No Right of Action on behalf of M.J., arguing that that the CINC case was closed without further review in October of 2017 and that the maternal relatives lacked standing to intervene and to seek modification of the disposition. The Exception of No Right of Action was denied. Counsel for C.P. joined in the maternal relatives' Motion to Modify Disposition. The parties agreed that the testimony taken would be applicable to both opposing Motions for Modification. The court heard the testimony of the parties.

The parties then entered into an interim stipulation wherein M.J. would retain legal custody of L.P.; the maternal relatives would continue to enjoy visitation with L.P. on the first and third weekends of each month; M.J.'s fiancé, S.P., would handle communication with the maternal relatives and bring L.P. to custody exchanges; M.J.

would have no contact with the maternal relatives except through Our Family Wizard; and, any visitation with C.P. would be supervised by at least one of the maternal relatives ("May 16, 2018 stipulations"). M.J., C.P., and each of the maternal relatives stated on the record that they understood and would abide by these stipulations. Mr. Dragon was tasked with drafting the judgment within the next ten days, though he did not do so. A written judgment was executed over five months later, on October 22, 2018 ("October 22, 2018 judgment"). The parties do not dispute that it is unclear who drafted and submitted the written judgment, and they agreed that the written judgment was inconsistent with the May 16, 2018 stipulations in certain respects. Particularly, while the written judgment ordered no contact between M.J. and the maternal relatives, except via Our Family Wizard, it did not contain a provision regarding S.P. handling communications with the maternal relatives on behalf of M.J.; and, rather than providing that S.P. would handle exchanges on behalf of M.J., it stated that L.A.P. would be the only maternal relative to have any contact with M.J. during exchanges.

On February 19, 2019, the maternal relatives, together with counsel for L.P., filed a "Motion for Contempt, Motion to Modify Disposition, and Incidental Relief" ("Joint Motion"). L.P. and the maternal relatives (collectively, "Appellees") requested that the trial court find M.J. in contempt for continued failure to abide by the visitation order. Appellees also sought a modification of the October 22, 2018 judgment and further clarification of visitation guidelines. The Joint Motion noted the inconsistencies in the May 16, 2018 stipulations and the October 22, 2018 judgment.

The Joint Motion was originally set for hearing on February 26, 2019. At the February 26, 2019 hearing, M.J.'s attorney, who had enrolled as counsel of record for M.J. on December 10, 2018, requested a continuance on the basis that she had been served with the Joint Motion the day before. She also filed an "Exception and Incorporated Memorandum in Support of Improper Use of Summary Proceeding" ("Exception of Improper Use of Summary Proceeding") on behalf of M.J. In his Exception of Improper Use of Summary Proceeding, M.J. contended that the Joint Motion was improper in form because it sought to declare the October 22, 2018 judgment a nullity. M.J. also argued that he had complied with the October 22, 2018

written judgment, and that he was not required to abide by the May 16, 2018 stipulations because they had been "overwritten" by the written judgment. The parties stipulated to continue all matters to April 1, 2019, and that M.J. would not participate in exchanges in the interim. As the parties could not agree regarding whom of the maternal relatives could participate in exchanges, the trial court directed that any one of the four maternal relatives could individually handle an exchange.

M.J.'s Exception of Improper Use of Summary Proceeding was taken up and denied at the outset of the April 1, 2019 hearing. Thereafter, the trial court heard testimony from each of the four maternal relatives, M.J., and M.J.'s fiancé S.P. Exhibits including photographs, video recordings, and audio recordings were admitted into evidence.[4] At the conclusion of the April 1, 2019 hearing, the trial court ordered that M.J. retain custody of L.P.; that the maternal relatives maintain collective visitation with L.P. on the first and third weekends of each month, and enjoy a specific vacation and holiday schedule set forth in the judgment; that the parties enroll in and communicate via Our Family Wizard; that M.J. may approve or deny the maternal relatives' requests to bring L.P. to church services; that all transfers of custody occur at the Slidell Police Department, between M.J.'s fiancé, S.P., and the maternal relatives; that M.J. have no contact with the maternal relatives, outside of Our Family Wizard; that an assessment and therapeutic recommendations were to be made and associated costs borne by M.J.; and that all of L.P.'s contact with C.P. be supervised by the maternal relatives. The trial court further found M.J. in contempt on five grounds: the filing of false information with a police department; violating the no contact order with the Maternal Relatives; allowing and fostering forbidden visitation with L.P.'s mother, C.P.; filing a verified motion and affidavit on February 7, 2019, with information known to be false; and, intentional behavior designed to intimidate the maternal relatives.

The trial court executed a written judgment on April 25, 2019, which provided in part:

---

[4] Upon receipt of the appellate record, certain exhibits M.J. introduced as evidence at the April 1, 2019 hearing were unable as unable to be viewed. This court issued an order for supplementation of the record, and timely received same. The supplementation included most of the evidence offered at trial and explained that while some data stored on cell phones degrades over time, the parties have stipulated that the missing evidence was not substantively different from the evidence provided. All exhibits that were not degraded were reviewed and considered in this court's opinion rendered herein.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that [M.J.] is found in constructive contempt of court for the following:

1. The filing of false information with the police department;

2. Violating the no contact order with the Maternal Relatives;

3. Allowing and fostering forbidden visitation with the mother, [C.P.];

4. Filing a verified motion and affidavit on February 7, 2019, with information known to be false.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that [M.J.] is sentenced to fifteen days in parish jail. The fifteen day sentence is fully deferred under the following conditions:

1. [M.J.] shall comply with all future orders and timely address the following:

   a. The Maternal Relatives shall be granted three additional weekends of visitation to be chosen and specified by the Maternal Relatives at least thirty days in advance via Our Family Wizard;

   b. [M.J.] shall pay the costs and attorney's fees associated with all three contempt filings in this matter. Said costs and attorney's fees shall be agreed upon by counsel for [M.J.] and counsel for the Maternal Relatives within fifteen days from the signing of this judgment. Should counsel for [M.J.] and counsel for the Maternal Relatives be unable to agree upon the costs and attorney's fees within fifteen days from the signing of this judgment, billing records shall be provided to the Court for an in camera inspection and counsel for [M.J.] and counsel for the Maternal Relatives may each provide a memorandum regarding their positions within seven days of the billing records being submitted to the Court. Once costs and attorney's fees are set, counsel for the Maternal Relatives will draft and submit for approval a judgment on that issue.

   c. [M.J.] shall have no contact with either counsel for the child, Betsy Smith or counsel for the Maternal Relatives, Kristen Stanley-Wallace.

On May 1, 2019, M.J. filed a motion and order for appeal. The trial court granted the appeal, ordering that it be a suspensive appeal "as to the suspended jail term for contempt only." In this appeal, M.J. asserts the following assignments of error:

1. The trial court erred in denying his exception of improper use of summary proceedings on April 1, 2019.

2. The trial court erred in maintaining the custody issues through a CINC disposition rather than transferring the case to the trial court for ordinary proceedings.

3. The trial court erred in granting the maternal relatives visitation, or in the alternative, in granting substantial visitation.

4. The trial court erred in continuing to appoint counsel for L.P., when the CINC case had been closed without further review.

5. The trial court erred in holding M.J. in contempt on April 1, 2019, or in the alternative, guilty of all the contempt alleged, and in the excessiveness of the penalties imposed.

6. The trial court erred in ordering M.J. to have no contact with the maternal relatives.

7. The trial court erred in ordering M.J. to have no contact with counsel for the maternal relatives or counsel for the child.

## DISCUSSION

### ASSIGNMENT OF ERROR NO. 2

M.J.'s second assignment of error is that the trial court erred in maintaining the custody issues through a CINC disposition rather than transferring the case to the trial court for ordinary proceedings. M.J. contends that the trial court no longer has jurisdiction, and the Children's Code no longer applies, because there has been no State involvement since October of 2018; a permanent placement has been made; the child is no longer in need of care; a fit parent has custody; the mother is not incarcerated or interdicted; and there is no evidence of recent drug use.[5] Thus, M.J. argues that this matter should have been referred to a court with family jurisdiction to be resolved under the Civil Code.

In response, Appellees contend that LSA-Ch.C. arts. 303, 309, and 686 authorize and dictate this maintenance of jurisdiction. Moreover, Appellees argue that it is undisputed that the trial court retained jurisdiction of this matter. The judgment dated October 31, 2017, stated that the "case [was] closed without further review" and "the Juvenile Division retains jurisdiction for any modifications until the child reaches the age of 18."[6] Likewise, the Special Review Judgment dated November 2, 2017, and the October 22, 2018 judgment, both provide "the duration of this disposition shall be until the minor child reaches the age of majority (18) or further orders of this Honorable

---

[5] M.J. also claims that the restrictions imposed by a CINC disposition bind him to St. Tammany Parish until his daughter turns eighteen because he cannot avail himself of LSA-R.S. 9:355, which governs the relocation of a child's residence, unless the trial court voluntarily cedes custody. However, M.J. provides no authority in support of this argument. M.J. further argues he is unable to avail himself of LSA-R.S. 13:1700, et seq., if the case is not transferred. However, LSA-R.S. 13:1700, et seq., was repealed in 2006.

[6] The October 31, 2017 judgment of the trial court provided in part:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the case is closed without further review.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Juvenile Division retains jurisdiction for any modifications until the child reaches the age of eighteen.

The October 22, 2018 judgment provided in part:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the duration of this disposition shall be until the minor children reach the age of majority (18) or further orders of this Honorable Court pursuant to Louisiana Children's Code Article 686. This Court retains exclusive continuing jurisdiction over this proceeding pursuant to Article 303 and 309 of the Louisiana Children's Code.

Court pursuant to Louisiana Children's Code Article 686," and specified that "this matter be closed without review."[7]

CINC proceedings are governed by LSA-Ch.C. arts. 601-725.6. The purpose of the proceedings is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others. The health, safety, and best interest of the child shall be the paramount concern in all CINC proceedings. See LSA-Ch.C. art. 601; **State in Interest of A.S.**, 2019-0248 (La.App. 1 Cir. 9/4/19), 285 So.3d 1129, 1134.

Louisiana Children's Code article 303(2) provides that a court exercising juvenile jurisdiction shall have exclusive original jurisdiction over CINC proceedings. Louisiana Children's Code article 313(A) specifies those instances which may terminate juvenile jurisdiction: declination of jurisdiction, transfer of the proceeding, expiration or satisfaction of an informal adjustment agreement; expiration or satisfaction of an informal family services plan agreement; expiration, satisfaction, or vacation of a juvenile disposition or adult sentence; and dismissal of the proceeding. Significant to our analysis, by Acts 1992, Number 705, Section 1, the Legislature deleted former subpart (7), "permanent placement of the child," from LSA-Ch.C. art. 313's list of bases for termination of a juvenile court's jurisdiction. **State In Interest of M.A.**, 2013-0267 (La.App. 1 Cir. 6/7/13), fn 1, writ denied **State in Interest of M.A.**, 2013-1625 (La. 10/11/13), 123 So.3d 1228. On this point, the 1992 comment to LSA-Ch.C. art. 313 explains:

> The deletion of Article 313(7), permanent placement of the child, reflects the fact that the court retains jurisdiction, even though a permanent placement has been achieved for the child, for any disputes arising thereafter in connection with the placement. Thus, according to Article 702(B), although a court is relieved of the responsibility for conducting periodic judicial reviews when a child achieves a "permanent placement" as defined by Article 603(15), it does not lose jurisdiction.

Further, LSA-Ch. C. art. 309 pertinently provides:

> A. Except as provided in Article 313, *a court exercising juvenile jurisdiction shall have continuing jurisdiction over the following proceedings and the*

---

[7] M.J. argues that this judgment "transfers" the case to the City Court of Slidell. This is incorrect. The judgment states in part that "[t]he City Court of Slidell retains exclusive and continuing jurisdiction over this proceeding..." However, as this matter has never been before the City Court of Slidell, this is clearly a typographical error.

*exclusive authority to modify any custody determination rendered*, including the consideration of visitation rights:

(1) Child in need of care proceedings pursuant to Title VI.

(Emphasis added.)

Interpretation of any statute begins with the language of the statute itself. **David v. Our Lady of the Lake Hosp., Inc.**, 2002-2675 (La. 7/2/03), 849 So.2d 38, 46. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. LSA-C.C. art. 9. The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting it. Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. It is presumed that the intention of the legislative branch is to achieve a consistent body of law. **McLane Southern, Inc. v. Bridges**, 2011-1141 (La. 1/24/12), 84 So.3d 479, 483.

Louisiana Children's Code article 303(2) establishes that a court exercising juvenile jurisdiction shall have exclusive original jurisdiction over CINC proceedings. Further, LSA-Ch.C. art. 309 specifically states that a court exercising juvenile jurisdiction has the *exclusive authority* to modify any custody determination rendered in a CINC proceedings, including the consideration of visitation rights. The specific grounds for termination of this exclusive original jurisdiction are set forth in LSA-Ch.C. art. 313, none of which are present in this case. To the contrary, the 1992 comment to LSA-Ch.C. art. 313 reflects that the trial court does not lose jurisdiction even after permanent placement has been achieved, and instead retains jurisdiction "for any disputes arising thereafter in connection with the placement," such as the disputes in the instant matter. This language is clear and unambiguous, and does not lead to absurd results. Therefore, we need make no further search for the intent of the legislature.

We do, however, note that a further review of the other laws on this subject matter provides additional support for our conclusion. Louisiana Children's Code article 686 provides that a judgment of disposition remains in force until a child reaches his eighteenth birthday, expires on its own terms, is modified, or is vacated. Louisiana Children's Code article 714(A) provides that a disposition may be modified upon the motion of the district attorney, the department, the child, the parents, or the trial court. Pursuant to LSA-Ch.C. art. 716, the trial court may then modify the disposition "if the court finds that the conditions and circumstances justify the modification." These articles corroborate the rule that the trial court is empowered to maintain jurisdiction in a CINC proceeding even after permanent placement. Further, in setting forth the governing rules and standards for modification of disposition, they also establish that the Children's Code continues to apply in such proceedings. To conclude otherwise would render those portions of the Children's Code addressing the modification of a judgment of disposition meaningless. This conclusion is also in conformance with the well-established rule that in determining the applicability of laws the more specific governs over the more general. See **Thompson v. BGK Equities, Inc.**, 2004-2366 (La.App. 1 Cir. 11/4/05), 927 So.2d 351, 353, writ denied, 2005-2405 (La. 3/17/06), 925 So.2d 550.

The plain language of the applicable laws clearly and consistently authorizes both the trial court's maintenance of jurisdiction, and the application of the Children's Code, over the issues in this matter. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 1

M.J.'s first assignment of error is that the trial court erred in denying his exception of improper use of summary proceedings on April 1, 2019. M.J. claims that the maternal relatives essentially sought to nullify the October 22, 2018 judgment[8] and therefore this matter should have been brought by ordinary action. M.J. then asserts

---

[8] In his brief, M.J. states that the maternal relatives' Motion for Contempt filed January 23, 2018, was effectively a motion to nullify the judgment "filed on October 22, 2017" and therefore should have been brought by ordinary action. However, it appears that the reference to a judgment dated October 22, 2017, was a typographical error. The record reflects that M.J.'s Exception of Improper Use of Summary Proceeding was filed on February 26, 2019, in response to the Joint Motion filed by L.P. and her maternal relatives on February 19, 2019. Further, the January 23, 2018 Motion for Contempt predates the October 22, 2018 judgment M.J. alleges it purportedly sought to nullify.

13

that the proper procedural mechanism would have been a motion to modify disposition. M.J. alleges that "[a]lthough the attorney for the child joined in the most recent motion for contempt and modification of visitation, the motion was tried by counsel for the maternal relatives," whom M.J. alleges lack standing to bring a motion to modify disposition. After arguing in his appellate brief that a motion to modify disposition was the proper procedural mechanism, M.J. then asserts in his reply brief that the judgments L.P. and her maternal relatives sought to modify were visitation orders, "not the disposition of the CINC case, which was closed in 2017."

Appellees assert that M.J.'s arguments on this point are based on the false premise that the Joint Motion sought to nullify the October 22, 2018 judgment. Appellees contend that the Joint Motion essentially requested a modification of the disposition, governed by LSA-Ch.C. art. 714, *et seq.*, and a motion for contempt, governed by LSA-Ch.C. art. 1507. Further, although the maternal relatives lack standing to seek modification of the disposition, Appellees point out that the Joint Motion was filed by L.P. and the maternal relatives together, and L.P. does have standing to seek modification of the disposition. Finally, Appellees maintain that this matter was and remains a CINC case in which the application of the Children's Code is appropriate.

We agree. Louisiana Children's Code art. 714(A) provides in pertinent part, "[t]he court may modify a judgment of disposition on its own motion or on the motion of the district attorney, the department, the child, or his parents." The April 25, 2019 written judgment M.J. appeals herein explicitly states that the matter "came for hearing on [L.P.'s] and [the maternal relatives'] Joint Motion for Contempt, Motion to Modify Disposition and Incidental Relief" ("Joint Motion"). L.P. has standing to bring a motion to modify the disposition under LSA-Ch.C. art. 714(A), and the record plainly reflects that she did so in the Joint Motion filed on February 19, 2019. Further, as discussed above, the plain language of LSA-Ch.C. art. 313, and the 1992 comment to same, make clear that although a court is relieved of the responsibility for conducting periodic judicial reviews when a child achieves a permanent placement, it does not lose jurisdiction over any disputes arising thereafter in connection with the placement; to the contrary, LSA-Ch.C. art. 716 provides that a judgment of disposition may be modified if

14

the court finds that the conditions and circumstances justify the modification. Thus, the matters appealed herein were properly before the trial court under its authority to modify its previous judgments of disposition on the motion of the child. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 3

M.J.'s third assignment of error is that the trial court erred in granting the maternal relatives' visitation, and alternatively, that the visitation is excessive because it amounts to sixty-seven days per year. M.J. argues that he is a fit parent, that C.P. is no longer incarcerated, and that there is no evidence that C.P. continues to use illegal drugs, such that there are no extraordinary circumstances warranting a grant of visitation to the maternal relatives as contemplated in LSA-C.C. art. 136. M.J. also contends that the trial court failed to consider that under LSA-C.C. art. 136(D)(1), a parent has a fundamental right to make decisions regarding their child, and that the maternal relatives have been disrespectful to M.J.'s religious beliefs.

In response, Appellees argue that the trial court has more than adequate basis for granting the maternal relatives visitation with L.P. Appellees point out that the trial court has, over the course of these proceedings, heard hours of testimony regarding the bond L.P. has with the maternal relatives, the lack of bonding between L.P. and M.J., the aggression M.J. consistently demonstrates towards the maternal relatives both in and out of L.P.'s presence, the repeated disregard M.J. displays to the authority of the trial court, and L.P.'s reactions to being returned to M.J. Appellees argue that they have provided L.P. with stability and are the only avenue through which L.P. has visitation with C.P. Appellees further maintain that if the maternal relatives were not granted visitation, M.J. would likely prevent L.P. from continuing her relationship with the maternal relatives.

Louisiana Children's Code article 702(D), governing permanent placement, provides:

> The court shall consider a child's need for continuing contact with any relative by blood, adoption, or affinity with whom the child has an established and significant relationship in accordance with Article 1269.2 as one of several factors in determining the permanent plan that is most appropriate and in the best interest of the child.

15

In cases involving the custody of children, the trial court is vested with a vast amount of discretion. **State ex rel AR,** 99-0813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073, 1077. The trial court is in a better position to evaluate the best interests of a child because of its superior opportunity to observe the parties and the witnesses who testified at the trial. As an appellate court, we must afford great deference to the trial court's decision, not only because of that court's better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. Thus, the trial court's decision will not be disturbed on review except in the clearest case of abuse of the trial court's great discretion. *Id.* at 1078.

We summarize the extensive testimony received at the April 1, 2019 hearing on this matter as follows:

D.P., L.P.'s grandfather, testified that M.J. called him upon learning he may be L.P.'s father. M.J. expressed a desire to see L.P., but told D.P. that he was old, owned a business, and didn't have time to deal with L.P. D.P. explained to M.J. that it was his understanding that M.J. should contact DCFS to have visitation approved. After contacting DCFS, M.J. told D.P. "since I have to pay for everything that they want me to do, I'm just going to take the child." M.J. disputed D.P.'s testimony regarding their early conversations, specifically that M.J. initially stated he did not want custody of L.P. The maternal relatives consistently testified that they were not made aware that M.J.'s one-hour supervised visits with L.P. were going to accelerate to unsupervised weekend visits, and they felt that the transition should have been more gradual. The maternal relatives also uniformly testified that when L.P. returned from these early visits with M.J., she seemed fearful and did not want to be left alone in a room without her maternal relatives.

A.P. testified that L.P. had returned from her first visit with M.J. with a large bruise on her forehead. A.P. described other injuries L.P. sustained at M.J.'s home after he gained custody: a burn on her arm, bruises on her eyes, and bruises on the top of her ear. Photographs were accepted into evidence documenting these injuries. A.P. acknowledged that children have "accidents all the time," but testified that even so, some of L.P.'s injuries upon returning from M.J.'s home were concerning to her. On

16

cross-examination, A.P. stated that she does not believe that M.J. or his fiancé S.P. abuse L.P. When M.J.'s fiancé S.P. testified on this issue, S.P. stated that she has never seen M.J. behave in a physically violent way. S.P. provided explanations for the injuries L.P. sustained at M.J.'s home as different types of childhood accidents, stating that L.P. is "rough and tough."

The maternal relatives consistently testified that L.P. is happy with them and when they receive custody at exchanges. In contrast, the maternal relatives uniformly testified that L.P. cries and expresses that she wants to remain with her maternal relatives during exchanges when M.J. receives custody. The maternal relatives stated that L.P. physically clings to her maternal relatives, reaches for her maternal relatives, and pushes against M.J. L.A.P. stated that she became afraid for L.P. when she witnessed L.P.'s reactions to M.J. at exchanges. Further, each of the maternal relatives individually testified that M.J. was regularly rude and hostile to them in the presence of L.P. A.P. asserted that M.J. would say things such as "don't talk to me" or "I hate you". J.P. stated that M.J. was aggressive and called him a "bitch." J.P. also testified that M.J. would make statements to L.P. such as "those are not your people… [y]ou shouldn't be crying for them" when L.P. cried at exchanges.

S.P., M.J.'s fiancé, stated that L.P. is not normally fussy with M.J. or with her, and S.P. denied seeing L.P. resist going to M.J. at exchanges. S.P. identified photographs in which L.P. is seen playing or laughing with M.J. However, S.P. affirmed that L.P. typically cried when S.P. received custody of her at an exchange. S.P. and M.J. testified that they believe that L.P. is fussy when they receive her from the maternal relatives because she has usually been sleeping and is just waking up, or she is tired and agitated because she hasn't had a nap, whereas she is rested and dressed when her maternal relatives receive custody from M.J. and S.P. S.P. When asked "[h]ow is [L.P.] when she comes back from the home of [J.P. and A.P.]?" M.J. replied "[l]ike a spoiled little brat."

A.P. testified that on October 31, 2018, M.J. called A.P., in contravention of both the May 16, 2018 stipulations and the October 22, 2018 judgment. M.J. then brought

L.P. to an exchange, in contravention of the May 16, 2018 stipulations. M.J. admitted to contacting J.P. by telephone on October 31, 2018, and bringing L.P. to the exchange.

A.P. and J.P. testified that on December 24, 2018, A.P. and J.P. went to the Slidell Police Department to receive custody of L.P. When M.J. did not arrive as expected, A.P. texted S.P., but received no response. J.P. stated that M.J. then called him and told him that he was not bringing L.P. to the exchange because he had a new judgment stating this was his holiday. M.J. then called J.P. again, and when J.P. did not answer, M.J. left a voicemail stating that L.P. would not have two homes, that any Christmas presents the maternal relatives gave L.P. would have to go to his house, that C.P. was pregnant again, and that he hoped C.P. would remain in jail. M.J. admitted to contacting J.P. by telephone on December 24, 2018.

At an exchange on January 1, 2019, M.J. told A.P. and J.P. that he would only exchange with L.A.P. due to the written judgment. Notably, however, both M.J. and his fiancé S.P. acknowledged that the provision in the October 22, 2018 judgment, which stated that only L.A.P. could participate in exchanges on behalf of the maternal relatives, was inconsistent with the May 16, 2018 stipulations. Nevertheless, A.P. and J.P. called L.A.P. and D.P. and asked them to come pick up L.P. from M.J. at the Slidell Police Department. M.J. told A.P. and J.P. to leave, and they complied. However, because they had L.P.'s car seat, A.P. and J.P. returned to the Slidell Police Department. The maternal relatives consistently testified that M.J. handed L.P. to L.A.P., who handed L.P. to D.P., who carried L.P. to A.P. and J.P. and put her in the car seat in their vehicle. L.A.P. testified that when D.P. walked away, M.J. approached her. M.J. told L.A.P. that they needed to work out an agreement and leave the other maternal relatives out of it. L.A.P. declined and walked away.

An audio recording received into evidence documents a phone call M.J. made to 911 after the maternal relatives left the January 1, 2019 exchange. M.J. reported that he had met the maternal relatives for a custody exchange at the Slidell Police Department. M.J. stated that L.P.'s aunt and uncle became angry because he told them that L.P. was only supposed to be picked up by her grandmother. M.J. claimed that L.P.'s grandfather then snatched L.P. and "took off" with her. M.J. stated that he was

18

following the vehicle and provided a license plate number. M.J. then filed a police report accusing the maternal relatives of kidnapping L.P. Regarding the events of January 1, 2019, M.J. testified that D.P. had "snatched [L.P.] from [him]." M.J. said he tried to go into the police station for help, but it was empty, so he called 911 and followed A.P. and J.P. M.J. stated that he told 911 he was assaulted by D.P., that D.P. snatched L.P. out of his hand, that D.P. hit M.J. in the side, and took L.P. to J.P.'s truck. M.J. said that he "wanted to make sure my daughter didn't have any scars or anything of that sort. Because it was that violent."

L.A.P. testified that after the January 1, 2019 exchange, M.J. repeatedly told her he was not going to give L.P. to her at an exchange if D.P. was present. L.A.P. testified that she did not and would not have agreed to be the only one of the four maternal relatives to handle exchanges of L.P. L.A.P. testified that she felt intimidated by M.J. and was scared to meet him to exchange L.P. without her husband, but she did so anyway because she loves L.P. A.P. and J.P. did not attend another exchange until after the February 26, 2019 hearing at which the trial court directed that any of the four maternal relatives were permitted to meet S.P. to exchange custody of L.P. A.P. testified that when S.P. handled the exchanges, there were no problems. A.P. produced recordings of these exchanges, which were accepted into evidence.

The maternal relatives testified that repeatedly returning to court because of visitation issues had cost them thousands of dollars, as well as heartache, stress, and anxiety caused by their separation from L.P. A.P., J.P., and L.A.P. hoped that the maternal relatives would receive fifty-fifty shared custody of L.P. In addition, A.P. affirmed that she would be in favor of coordinating visitation so that M.J. and his fiancé would have L.P. on the same weeks they have custody of S.P.'s children. L.A.P. expressed a desire to have a good relationship with M.J. for L.P.'s sake. The maternal relatives consistently denied that they sought to interfere with L.P.'s relationship with M.J. Rather, they expressed a desire for L.P. to have an equal amount of time with each side of her family. D.P. explained he was concerned that if he was given the opportunity, M.J. would keep L.P. away from her maternal family completely. When the maternal relatives have visitation with L.P., they make an effort for L.P. to spend time

19

with her half-sister, C.P.'s other daughter, A.P. L.P. also has a very close relationship with A.P. and J.P.'s son. L.P. calls both C.P. and A.P. "mommy," and calls both M.J. and J.P. "daddy." However, S.P. corrects L.P. if she refers to A.P. or J.P. as "mommy" and "daddy."

The maternal relatives testified that they had never permitted C.P. to have unsupervised visitation with L.P. M.J. described making arrangements a "[c]ouple of months ago" for C.P. to see L.P. when the maternal relatives would not permit it. When questioned regarding his understanding of the order that L.P.'s visitation with C.P. be supervised by the maternal relatives, M.J. stated "So the maternal relatives have more rights to my child and make me make a decision who sees my child? Who wrote this?"

In this matter, the maternal relatives cared for L.P. for nearly a year when her mother was unable to care for her and her father was unknown. The record plainly reflects the existence of a close and loving relationship between L.P. and her maternal relatives. The maternal relatives also foster a relationship between L.P. and her half-sister. Given the highly contentious nature of the relationship between M.J. and the maternal relatives, and especially considering M.J.'s history of withholding L.P. from visitation with her maternal relatives, the record before us indicates that termination of the maternal relatives' visitation would seriously threaten L.P.'s relationship with her maternal relatives and, consequently, with her half-sister. Loss of these relationships would be detrimental to L.P.

Moreover, because C.P. continues to struggle with maintaining her sobriety, C.P does not have custody of L.P. The maternal relatives are exclusively designated to provide the necessary supervision of C.P.'s visitation with L.P. Therefore, L.P.'s visitation with the maternal relatives promotes and continues her relationship with her mother.[9] Thus, having thoroughly reviewed the record in the instant case, we find that the trial court's grant of visitation to the maternal relatives, with whom L.P. has an established and significant relationship, did not constitute an abuse of discretion. The evidence

---

[9] See **State in Interest of C.K.**, 2016-0305 (La.App. 1 Cir. 9/1/16) (unpublished), 2016 WL 4586039, at *3.

plainly reflects that this visitation is in the best interests of the child. This assignment of error lacks merit.[10]

## ASSIGNMENT OF ERROR NO. 4

M.J.'s fourth assignment of error is that the trial court erred in continuing to appoint counsel for L.P. when the CINC case had been closed without further review. M.J. argues that appointment of counsel beyond the involvement of the State would require application of LSA-R.S. 9:345, which governs the appointment of an attorney on behalf of a child in a custody or visitation proceeding, rather than LSA-Ch.C. art. 558, which establishes the Louisiana Child Representation System under the oversight of the Louisiana Supreme Court. M.J. also contends that the continuing appointment of counsel for the child "appears to have been factionalizing of the attorney for the child with the maternal relatives, and then a joint effort between the state-paid attorney and private counsel for the maternal relatives." M.J. closes his argument by claiming that counsel for the child has never visited M.J.'s home or made any significant interview or investigation of M.J. or S.P., in conflict with the Louisiana Supreme Court's directives regarding the duties of counsel for the child.[11]

Again, having already concluded that the trial court has properly maintained this matter as a CINC proceeding, we find that the Children's Code applies. Louisiana Children's Code article 607 provides:

> A. The court shall appoint the program designated for the jurisdiction by the Louisiana Supreme Court to provide qualified, independent counsel for the child at the time the order setting the first court hearing is signed. Neither the child nor anyone purporting to act on his behalf may be permitted to waive this right.
>
> B. The child shall be a party to the proceedings, and the attorney for the child shall have the authority to represent the child at all stages of the proceedings. The attorney for the child shall have the authority to take actions, including but not limited to the following:
>
> > (1) Accompany the child and be present for all court appearances, school hearings, and educational and other meetings related to the child.

---

[10] As M.J.'s arguments focus primarily on LSA-C.C. art. 136, and the trial court's oral reasons referenced LSA-C.C. art. 136, we note that we would reach the same conclusion under LSA-C.C. art. 136 as we have upon application of LSA-Ch.C. art. 702(D).

[11] We also note that M.J. maintains that the trial court erred by failing to hold a hearing to determine the suitability of maintaining the appointment of counsel for L.P. as required by LSA-C.C. art. 136(C).

(2) View and copy the child's medical, dental, psychological, psychiatric, educational, or counseling records.

C. If the court finds that the parents of the child are financially able, it may order the parents to pay some or all of the costs of the child's representation in accordance with Children's Code Articles 320 and 321.

D. In any dispositional or postdispositional hearing which may result in the mental health institutionalization of a child who is in the custody of the state, the child shall be entitled to representation by an attorney appointed by the Mental Health Advocacy Service, unless unavailable as determined by the director.

The 1991 comment A to LSA-Ch.C. art. 607 provides in part:

Paragraph A is added in keeping with current jurisprudence requiring independent counsel for the child when there is a conflict in interest between parent and child. See, **In the Interest of Von Rossum**, 515 So.2d 582 (1st Cir. 1987); **State in the Interest of Brown**, 387 So.2d 1366 (4th Cir.), writ denied, 394 So.2d 615. Since "independent" counsel is appointed, it follows that parents ought not to control the decision of selecting and retaining private counsel.

Under LSA-Ch.C. art. 607(A), it is impossible to waive L.P.'s right to counsel. The reason for this is plainly identified in the 1991 comment to the statute: to safeguard the child's best interest in the event of "a conflict in interest between parent and child." Moreover, LSA-Ch.C. art. 607(B) specifically requires that L.P. be represented by counsel "at all stages of the proceedings," which would include these proceedings to modify the previous disposition. Additionally, as discussed above, LSA-Ch.C. art. 714(A) establishes that L.P. has the right to make a motion to modify a judgment of disposition, which she could not do in the absence of counsel to make the motion on her behalf. For all of these reasons, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 5**

M.J.'s fifth assignment of error is that the trial court erred in holding M.J. in contempt on April 1, 2019, or in the alternative, guilty of all the contempt alleged, and in the excessiveness of the penalties imposed. As stated above, the trial court found M.J. in contempt on four different grounds: filing false information with the police department; violating the no contact order with the maternal relatives; allowing and fostering forbidden visitation with the mother, C.P.; filing a verified motion and affidavit on February 7, 2019, with information known to be false; and intentional behavior designed to intimidate the maternal relatives. M.J. was sentenced to fifteen days in jail, which sentence would be deferred if M.J. complied with future orders of the court,

22

permitted the maternal relatives three additional weekends of makeup visitation, paid the costs and attorney's fees associated with the contempt filings, and refrained from contact with counsel for L.P. and counsel for the maternal relatives.

Louisiana Children's Code article 319 provides general authority for a contempt proceeding. Louisiana Children's Code article 1503, allows "each juvenile court to enforce its orders and maintain proper court decorum." A contempt may be direct or constructive. See La. Ch.C. arts. 1504(B), 1505, 1507. Louisiana Children's Code article 1507 provides, in pertinent part, that a constructive contempt of court is any contempt other than a direct one, including but not limited to the following:

> ...
>
> (2) **Willful disobedience of any lawful judgment, order, mandate, writ, or process of the court.**
>
> ...
>
> (4) Deceit or abuse of the process or procedure of the court by a party to an action or proceeding, or by his attorney.
>
> ...
>
> (10) Any other act or omission punishable by law as a contempt of court, or intended to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority, and which is not a direct contempt.

(Emphasis added).

Under LSA-Ch.C. art. 1509 B, "an adult person charged with contempt to perform ... may be imprisoned until he performs it and in such a case this shall be specified in the court's order."

In a civil contempt case, the punishment is remedial or coercive; punishment in a criminal contempt case is punitive and intended to vindicate the authority of the court. **Estate of Graham v. Levy**, 636 So.2d 287, 290 (La.App. 1 Cir. 1994), writ denied, 94-1202 (La. 7/1/94), 639 So.2d 1167. The character of the relief imposed is thus ascertainable by applying a few straightforward rules. If the relief provided is a sentence of imprisonment, it is remedial if the defendant stands committed unless and until he performs the affirmative act required by the court's order, and is punitive if the sentence is limited to imprisonment for a definite period. If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the

23

court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order. **de Baroncelli v. de Baroncelli**, 2011-0271 (La.App. 1 Cir. 6/10/11) (unpublished), 2011 WL 3558187, at *3, n. 2.

Under these standards, the jail sentence imposed in this matter is remedial or coercive, as the incarceration order contains a "purge clause" permitting M.J. to avoid the sentence by complying with all future orders, granting the maternal relatives three additional weekends of visitation, paying the costs and attorney's fees associated with the maternal relatives' three contempt filings, and refraining from contact with counsel for L.P. and counsel for the maternal relatives. See **Graham**, 636 So.2d at 290.

A trial court is vested with great discretion in determining whether a party should be held in contempt, and its decision will only be reversed when the appellate court discerns an abuse of that discretion. **Rogers v. Dickens**, 2006-0898 (La.App. 1 Cir. 2/9/07), 959 So.2d 940, 945. However, the predicate factual determinations underlying the finding of civil contempt of court are reviewed under the manifest error standard of review. **Schmidt v. Schmidt**, 2018-0202 (La.App. 1 Cir. 1/3/19), 270 So.3d 804, 809. Pursuant to this standard, the two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the juvenile court; and 2) whether the record further establishes that the finding is not manifestly erroneous. **State ex rel. E.F., Jr.**, 2010-1185 (La.App. 1 Cir. 10/29/10), 49 So.3d 575, 582. If a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. *Id.* Even though an appellate court may feel its own evaluations and inferences are as reasonable as the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989).

The trial court found M.J. in contempt for allowing and fostering forbidden visitation with L.P.'s mother, C.P. On this matter, M.J. admitted that he allowed C.P. visitation with L.P. In this appeal, M.J. argues that he stated this occurred "a couple of

24

months ago" and it is therefore unclear whether the visitation was specifically prohibited at that time. However, the requirement that C.P.'s visitation with L.P. be supervised by the maternal relatives has been in place since the October 31, 2017 judgment was executed. This requirement was included in the May 16, 2018 stipulations and the subsequent October 22, 2018 judgment memorializing same. Despite the consistent prohibition against C.P. enjoying visitation with L.P. in the absence of the maternal relatives' supervision, M.J. admitted, and does not now dispute, that he allowed C.P. to have unsupervised visitation with L.P. a few months prior to the April 1, 2019 hearing. Therefore, having thoroughly reviewed the record before us, we find that the trial court did not err in finding that M.J. allowed and fostered the forbidden visitation, and that the trial court did not abuse its discretion in finding M.J. in contempt for doing so.

The trial court found M.J. in contempt for filing a verified motion and affidavit on February 7, 2019, with information known to be false, in connection with M.J.'s Motion for Contempt with Request for Ex Parte Relief and Civil Warrant, and Rule for Modification of Visitation. As noted above, these pleadings alleged, in part, that the maternal relatives subjected L.P. to a "toxic environment where drugs are rampant and constant in the residence" and "viciously and systematically alienated [M.J.] and kept [L.P.] away from [M.J.] using psychological intimidation and repeatedly refusing to allow [M.J.] to see and communicate with [L.P.]."[12] M.J. argues that he was rushed into signing the affidavit by his attorney, and that he was purged of this contempt by voluntarily withdrawing the allegations. However, the trial court evidently rejected M.J.'s explanation. The trial court's credibility determination is entitled to deference from this court, and is supported by the record. See **Rao v. Rao**, 2005-0059 (La.App. 1 Cir. 11/4/05), 927 So.2d 356, 367, writ denied, 2005-2453 (La. 3/24/06), 925 So.2d 1232. Further, a party signing a document is presumed to have consented to its contents and cannot avoid resulting obligations by contending that he did not read or fully understand it. A signature to a contract is not a mere ornament. **Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters**, 2001-2219 (La.App. 1st Cir.

---

[12] L.A.P. testified that M.J.'s allegations that the maternal relatives used drugs and exposed L.P. to drugs in their homes could have destroyed her reputation in the community as a teacher.

11/20/02), 837 So.2d 11, 24, <u>writs denied</u>, 2003-0418 (La. 4/21/03), 841 So.2d 805; 2003-0417, 2003-0427, 2003-0438 (La.5/16/03), 843 So.2d 1129, 1130. Having thoroughly reviewed the record before us, we find that a reasonable factual basis exists for the trial court's finding that M.J. knowingly filed the verified motion and affidavit with information known to be false and that the trial court's finding was not manifestly erroneous. Therefore, the trial court did not abuse its discretion in finding M.J. in contempt on this ground.

The trial court also found M.J. in contempt for violating the no contact order with the Maternal Relatives. Although M.J. admitted to violating the no contact order, he argues in this appeal that all of the parties failed to enroll in Our Family Wizard as ordered, and S.P. was not available to handle the exchanges, forcing him to choose between violating the no contact order or the visitation order. M.J. also claims that the maternal relatives initiated some of the contact. However, the issues of the maternal relatives' compliance with the no contact order is not properly before this court. Moreover, the no contact order was clearly in place for the benefit of the maternal relatives. Having thoroughly reviewed the record before us, we find that a reasonable factual basis exists for the trial court's finding that M.J. violated the no contact order, such that the trial court's finding was not manifestly erroneous. Therefore, the trial court did not abuse its discretion in finding M.J. in contempt on this ground.

M.J. argues that the trial court erred in finding him in contempt for filing false information with the police department regarding the events of April 1, 2019. M.J. claims that this finding equates to a determination of guilt of filing a false police report, which is a criminal act under LSA-R.S. 14:59(A)(5), and must be prosecuted by the district attorney. Appellees argue that the trial court found M.J. guilty of filing false information with the police department, not for filing a false police report, and that filing false information with the police department constitutes an act intended to obstruct or interfere with the orderly administration of justice in violation of LSA-C.C.P. art. 224(10). With respect to the events of April 1, 2019, the maternal relatives testified consistently with one another, while M.J.'s testimony conflicted with that of the maternal relatives. It is settled that reasonable evaluations of credibility and reasonable

inferences of fact should not be disturbed upon review where conflict exists in the testimony. **Rosell**, 549 So.2d at 844. Therefore, we find that the trial court did not err in finding that M.J. filed false information with the police department, and the trial court did not abuse its discretion in finding M.J. in contempt on this point.

M.J. also argues that the trial court erred in finding him in contempt for intentional behavior designed to intimidate the maternal relatives. However, as with the finding in contempt for filing false information with the police department, the maternal relatives testified consistently with one another, while M.J.'s testimony conflicted with that of the maternal relatives. We cannot disturb the trial court's reasonable evaluations of credibility and reasonable inferences of fact where conflict exists in the testimony. See **Rosell**, 549 So.2d at 844. Therefore, we find that the trial court did not err in finding that M.J. engaged in behavior intended to intimidate the maternal relatives, and the trial court did not abuse its discretion in finding M.J. in contempt on this ground.

M.J. further argues that the penalties assessed by the trial court for these five findings of contempt are excessive and indefinite, specifically with respect to the order that M.J. pay Appellee's attorney's fees and the order for assessment and therapeutic recommendations, with the costs to be borne by M.J. We disagree. The April 25, 2019 judgment sets forth a procedure by which M.J. and counsel for Appellees may determine the amount of attorney's fees owed, and it provides for an *in camera* inspection so that the trial court may rule on this issue if the parties cannot agree. With respect to the order for assessment and therapeutic recommendations, we find it is clear from the judgment that M.J. is the party to be evaluated, the basis for same being the numerous behaviors for which M.J. was held in contempt. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 6

M.J.'s sixth assignment of error is that the trial court erred in ordering M.J. to have no contact with the maternal relatives, except through use of Our Family Wizard. M.J. contends that under this order, he is effectively deprived of communication with L.P. for extended periods of time when she is with the maternal relatives. M.J. further argues that Our Family Wizard is too slow and cumbersome to use when there are

27

simple emergencies such as sudden illness or car trouble. Appellees maintain that there is a basis in the record for the no contact order, considering M.J.'s aggressive and hostile behavior towards them, and that Our Family Wizard can be accessed from a smart phone application that permits real-time communication in the same manner as text messages. We agree. This assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 7**

M.J.'s seventh assignment of error is that the trial court erred in ordering M.J. to have no contact with counsel for the maternal relatives or counsel for the child. M.J. argues in his original appellate brief that he has acted *pro se* at various times during this litigation and is not currently represented in the trial court, such that this order will deprive him of the right to represent himself, and effectively denies him access to the Courts. In response, Appellees also point out that the order does not deny M.J. access to the courts should he wish to proceed *pro se*, as he can file pleadings and have them served on counsel through the court. We agree with Appellees.

M.J. then argues in his reply brief, wherein he is represented, that the order precludes M.J.'s counsel from direct negotiation with counsel for Appellees. We reject this argument as the order does not prohibit counsel for M.J. from contacting counsel for Appellees; it simply precludes M.J. individually from contacting counsel for Appellees.

The record contains evidence that M.J. has displayed aggression towards Appellees' counsel. S.P., M.J.'s fiancé, testified that she had witnessed M.J. confront counsel for the child outside of the courtroom after a previous hearing, and that she can see how M.J. can be intimidating. Counsel for the child then states that after that initial confrontation, court deputies have escorted her to her vehicle following hearings at which M.J. is present. M.J. later testified, "But I don't blame [the maternal relatives] for what's happening. I blame her, [counsel for L.P.]. I know you guys don't want to hear this, but she has manipulated the records." Further, the record is replete with examples too numerous to list of M.J. exhibiting hostility – towards the court, the hearing officer, and the maternal relatives. Having thoroughly reviewed the record before us, we find a reasonable basis exists to support the trial court's order prohibiting

M.J. from direct contact with counsel for Appellees. This assignment of error lacks merit.

## DECREE

Based on the foregoing, the April 25, 2019 judgment is affirmed. All costs of this appeal are assessed to M.J.

**AFFIRMED.**

STATE OF LOUISIANA,                    NO. 2019 CJ 1023

IN THE INTEREST OF L.P.                COURT OF APPEAL

                                       FIRST CIRCUIT

                                       STATE OF LOUISIANA



**HOLDRIDGE, J., dissenting.**

I respectfully dissent from the majority opinion. It is clear that courts exercising juvenile jurisdiction have jurisdiction over Child in Need of Care (CINC) cases. La. Ch. C. art. 303(2). CINC proceedings are to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation. The health, safety, and best interest of the child shall be the paramount concern in all CINC proceedings. See La. Ch. C. art. 601. In this case, the minor child, L.P. was taken into custody by the state and a CINC case was filed because the child's mother, C.P., had put the child's health, safety, and best interest in jeopardy because of her actions. The custody of the child was placed with maternal relatives. The natural father of C.P. was found, and after a period of time, he was granted custody of C.P. and the "case was closed without further review." Once custody is given to a non-offending natural parent, there is no longer a CINC case and the Juvenile Court no longer had any jurisdiction to act. The majority opinion mistakenly interprets Louisiana Children's Code article 309 to hold that the Juvenile Court in this case has "continuing jurisdiction over the following proceedings and the exclusive authority to modify any custody determination rendered, including the consideration of visitation rights: (1) Child in need of care proceedings...."

However, there is NO CINC proceeding as to the natural father, M.J. He was not found to have placed the child's health, safety, and best interest in jeopardy, he was given custody of C.P., and the CINC case was closed! Without question,

Louisiana Children's Code article 686 does not require in this case for the judgment of disposition to remain in force until L.P. reaches her eighteenth birthday. The disposition expired in accordance with article 686 when it was modified and custody of L.P. was given to her natural father, M.J., and the CINC was closed. Once the non-offending parent (M.J., in this case) is awarded custody of the child and the case is closed, there is no longer a CINC case as to L.P., there is no longer a placement, and there is no disposition for the court to review or modify. The Juvenile Court no longer has jurisdiction. If the mother, maternal grandparents, or a third person off the street wants to be awarded custody or visitation with L.P., their recourse is to file a civil proceeding in the Family Court of the 21st Judicial District Court. As stated in the Author's Introductory Notes to Title VI, Child in Need of Care cases, "the power of the state (and the Juvenile Court) to intervene constitutes a significant intrusion into the constitutionally protected right of family privacy and parental decision-making." In this case, the right of the Juvenile Court to intervene ended when the custody of the child was given to her non-offending natural parent. The Juvenile Court is now depriving the non-offending parent, M.J. of his constitutional right of parental decision-making.