PARRO, J.
|2The parents of a minor child adjudicated a child in need of care appeal the judgment of the juvenile court[1] assigning the guardianship of the child to his godparents and closing the case of the State of Louisiana through the Department of Social Services, Office of Community Services (OCS), without further court review. *577 For the reasons that follow, we affirm the judgment of the juvenile court.
FACTUAL AND PROCEDURAL BACKGROUND
EJ,[2] the minor child at issue in this matter, was taken into the custody of OCS at the age of two months pursuant to an oral instanter order of custody after he was treated by physicians at Children’s Hospital in New Orleans with what the physicians deemed to be serious, non-accidental, life-threatening injuries. Specifically, EJ was found to have suffered multiple rib fractures and large bilateral subdural hematomas, which the physicians stated were consistent with inflicted trauma, such as child abuse. Neither the parents, nor any of the extended family members interviewed by OCS, could provide any explanation for the child’s injuries.
Included in the record is the report of Dr. Yameika Head, a forensic pediatrician at Children’s Hospital who interviewed JF and reviewed EJ’s medical records. According to this report, EJ was in normal health prior to December 8, 2008, based on the history provided by JF, the mother of EJ.[3] Prior to going to work that morning, JF bathed EJ, and she apparently noticed that he seemed very quiet. EF then babysat the children[4]1 swhile JF went to work.[5] Later, JF, EF, and EJ went to the mall, and JF noticed that EJ would not eat. She further noticed that EJ’s hands were pulsing, his eyes were looking to the left, and he was jittery. JF apparently called EJ’s doctor’s office, and the doctor told her to take EJ to the emergency department at Children’s Hospital. At that time, EJ was diagnosed with seizures and was given a full seizure work-up, including an MRI, CT scans, an EEG, and various other tests. EJ was then hospitalized until December 13, 2008, when he was released with medication to control the seizures.
Approximately ten days later, JF and her other son noticed that EJ’s head looked bigger than normal. However, no one took EJ to the doctor until several days later on December 27, 2008. On that date, JF was at work while EJ was again being cared for by EF. EF contacted JF at work and told her that he noticed EJ’s pulsing hand movement again. He later told her that EJ was alert, crying, and moving. When JF came home from work, she tried to feed EJ, but he would not eat. She also noticed the pulsing hand movement. JF then brought EJ to Children’s Hospital, where EJ was diagnosed with seizure activity again.[6] Various tests were performed on EJ, including a head CT and *578 a chest x-ray. The CT scan revealed fluid on the brain, so the Neurosurgery Department performed a subdural tap to relieve the pressure. The fluid on EJ’s brain was described in one part of Dr. Head’s report, as well as in the CT scan report dated December 28, 2008, as large bilateral chronic subdural hematomas most consistent with child abuse. The chest x-ray revealed multiple healing rib fractures of the left rib cage most consistent with non-accidental trauma. The fractures were believed to be approximately two to four weeks old.
Also included in the record is a letter signed by Dr. Lori A. McBride, EJ’s treating neurosurgeon, in which she noted that EJ was diagnosed with hematomas after he presented to the emergency room at Children’s Hospital with seizures, an enlarging |4head circumference, and a bulging fontanelle (soft spot). She acknowledged draining EJ’s hematomas several times while he was in the hospital, and she estimated that the blood within them was seven to twenty-one days in age when EJ was admitted. She also asserted that EJ’s injuries were clearly life-threatening and that he had evidence of permanent brain damage as a result of those injuries. Finally, Dr. McBride stated in her letter that the combination of injuries sustained by EJ, i e., the hematomas, combined with the elevated intracranial pressure and the rib fractures, were consistent with non-accidental trauma in her opinion.
After the initial subdural tap was performed to relieve the pressure on EJ’s brain, JF attempted to feed him. However, after he had eaten a little, one of the doctors noticed that EJ’s respirations were decreasing. Therefore, EJ was intubated and placed in the Pediatric Intensive Care Unit.
Dr. Head stated in her report that JF had provided no history of trauma, or any family or social history, that would explain the injuries that EJ had suffered. She also indicated that there was no evidence of a metabolic disorder or any bleeding or coagulation disorders that would explain the injuries. Nevertheless, Dr. Head asserted that EJ had physical findings of head trauma, as demonstrated by the bilateral chronic subdural hematomas, brain contusions, subarachnoid hemorrhages, and scalp edema that had been discovered upon examination. She also noted the skeletal trauma in the form of the multiple rib fractures suffered by EJ, which were palpable upon physical examination. She specifically stated that such fractures are generally suffered as the result of anteri- or-posterior compression (squeezing), a direct blow to the chest, or perhaps a crush injury. Dr. Head further asserted in her report that the seizure activity EJ was experiencing, and that had led to his latest admission to the hospital, was most likely due to the brain trauma he had sustained.
Dr. Head indicated in her report that she had reported the matter to the appropriate authorities, including OCS. Therefore, pursuant to LSA-Ch.C. art. 620(A), an oral instanter order was issued by the juvenile court on January 13, 2009, placing |Bthe child in the custody of the State. The next day, the juvenile court signed a written instanter order after it had received an affidavit from a representative of OCS setting forth the specific facts supporting the need for taking EJ into state custody. The child was placed with his godparents, Reverend Keith Boyd and his wife Kendra, and a continued custody hearing was held on January 22, 2009.[7] At the hearing, the *579 parents simply stipulated that there were reasonable grounds to retain the child in custody without admitting any of the allegations against them. Accordingly, the juvenile court signed a written judgment on February 26, 2009, finding that there were reasonable grounds to believe that EJ was a child in need of care and that continued custody with the State was in his best interest and was necessary for his safety and protection. The juvenile court further found that OCS had made reasonable efforts [8] to prevent or eliminate the need for removal of the child from his parents’ custody because there was a substantial immediate danger that precluded preventive services as an alternative to removal. Finally, the juvenile court found that OCS made reasonable efforts to reunify the child with his family, including searching for a suitable relative placement, to no avail.
On February 17, 2009, the State through the Office of the District Attorney for the Parish of St. Tammany filed a petition alleging that EJ was a child in need of care 16on the following grounds:[9]
The [child] is a victim of abuse and/or neglect perpetrated, aided or tolerated by the parent, caretaker or person who maintains an interpersonal dating or engagement [relationship] with the parent or caretaker, and the [child’s] welfare is endangered if he is left with the parent or caretaker; more particularly as shown on the affidavit in support of instanter order on the [sic] file in these proceedings and made apart [sic] hereof.
The petition was later amended to allege with more specificity what injuries the child had suffered while in the custody of his parents, i.e., bone (rib) fractures and subdural hematoma. In addition, the amended petition alleged that neither parent could account for how the injuries occurred, which placed the child at a risk of harm.
A hearing on the issue of whether EJ would be adjudicated a child in need of care was scheduled for May 5, 2009, after hearings scheduled for previous dates were opened and then recessed. However, after a lengthy pre-trial conference between the juvenile judge, the assistant district attorney, and the attorneys for each parent and the child, the parents again chose to enter a stipulation that the child was in need of care without admitting the allegations of the petition.[10] Accordingly, *580 the juvenile court adjudicated EJ to be a child in need of care, finding that the State had proven by a preponderance of the evidence that one or more of the grounds set forth in LSA-Ch.C. art. 606 existed.
The juvenile court then proceeded to the issue of disposition. According to the _Jjwritten judgment of adjudication and disposition signed May 29, 2009, the court found that the continued custody of the child with OCS was in the child’s best interest, as it was safe, appropriate, and the least restrictive, placement consistent with the circumstances of the case. The court further ordered that the case plan developed by OCS and dated February 16, 2009,[11] was in the best interest of the child and was made a part of the judgment. Pursuant to the case plan, the goal for the child was reunification with his parents, but the child was to remain in the physical custody of the Boyds until reunification was possible. The case plan also allowed the parents to have liberal visitation with EJ, as long as it was supervised by the Boyds. The judgment of adjudication and disposition was not appealed.
The various case plans in place for this family required that the parents maintain employment, that they maintain contact with OCS, that they provide support for their child while he remained in foster care, and that they attend family therapy and parenting classes, as well as various other requirements.[12] It is undisputed that the parents made progress on certain parts of them ease plan and that they were cooperative with OCS in partially complying with the requirements of the case plan. However, the case plan dated June 2009, also provided the following with regard to the specific issues, conditions, or behaviors that needed to be changed or demonstrated in order to keep the child safe:[13]
The parents will need to gain an understanding of the injuries their child sustained. They will need to acknowledge that the injuries were non-accidental in nature and that [EJ] was the victim of physical abuse. They need to be able to verbalize how they are going to be able to protect him in the future from an injury such as he has suffered.
| sIt is this portion of the case plan that is at issue in this matter, because OCS contends that while the parents have made progress with other parts of their case plan, they have not made any progress with this part.
On July 6, 2009, the juvenile court convened a six-month case review hearing pursuant to LSA-Ch.C. art. 692. The parents initially chose not to stipulate to any *581 thing at this hearing, as they had at previous hearings. JF testified at the hearing and denied any knowledge of how EJ had been injured. She indicated that she had questioned her mother, grandmother, and sister about whether they had ever accidentally dropped EJ while caring for him; however, she denied that she had ever asked EF if he had caused the injuries, accidentally or otherwise. She was never cross-examined, however, because after a recess and a conference with the juvenile judge in chambers, the parents again decided to stipulate without admission pursuant to LSA-Ch.C. art. 647. EF never testified at this or any other hearing.
In December 2009, OCS applied to the juvenile court for permission to have a subdural to peritoneal shunt inserted to help drain the fluid from EJ’s brain. According to the letter sent to the juvenile court by OCS, the accumulation of fluid in EJ’s brain had not drained in over six months, and Dr. McBride had recommended the insertion of the shunt. At the parents’ request, a second opinion was sought from another doctor; however, that doctor agreed with Dr. McBride, and the juvenile court approved the procedure.
Despite the recommendation of this procedure by two physicians, EF apparently did not see the need for such procedures and tended to minimize his son’s health issues according to at least one of the therapists and the Court Appointed Special Advocate (CASA) volunteer who worked with the family. According to a letter in the record from Dana Hulsey, one of the licensed clinical social workers appointed to work with the family, EF denied that EJ had any lasting injury or that he needed a shunt at all. Ms. Hulsey further noted that EF seemed strongly against further medical treatment for EJ’s injury during her sessions with him. Likewise, Lynn Bordes, the CASA volunteer, noted lnin her report dated December 23, 2009, that both parents tended to minimize the severity of his life-threatening injuries, preferring instead to focus on how well he was doing at the time.
The juvenile court convened a twelvemonth joint case review and permanency plan review hearing on April 6, 2010,[14] at which it also considered a joint motion to modify the judgment of disposition filed by the parents. The motion to modify primarily sought the return of EJ to his parents. However, as an alternative prayer for relief, the parents requested that E J be returned to the custody of JF with EF agreeing to temporarily vacate the family home, subject to his satisfactorily meeting certain guidelines set by the juvenile court. In addition to the motion to modify, at issue before the court was the recommendation by OCS that the permanent plan for EJ should be changed from reunification to a transfer of guardianship from his parents to the Boyds. OCS further requested that its case be closed without further court review.
According to the minute entry from the above hearing, the juvenile court apparently conducted a pre-trial conference and then notified counsel for all parties that they were allowed to file briefs on the matter. It appears that no new evidence or testimony was accepted into the record at this hearing; although the juvenile court’s written reasons for judgment indicate that the parties stipulated at the hearing that the parents had substantially complied with their case plan, they had not provided OCS with an explanation as to how their infant son had received serious, non-accidental, life-threatening injuries.[15] *582 The juvenile court gave the parents and the State the option to submit briefs on the issues within thirty days of the hearing. The parents submitted a joint brief, but the State did not submit a brief.
After reviewing the parents’ brief and the record, the juvenile court issued [ mwritten reasons for judgment, finding that it was clearly in EJ’s best interest to live outside his parents’ home. Therefore, the juvenile court granted guardianship of the child to the Boyds as the most appropriate and least restrictive placement. The juvenile court later signed a judgment in accordance with its written reasons, decreed permanent placement with the Boyds, and closed the OCS case without further review.[16] It is from this judgment that the parents have appealed.[17]
DISCUSSION
In their sole assignment of error on appeal, EF and JF contend that the juvenile court erred in assigning guardianship to the Boyds, when EJ’s injuries were never confirmed to have been caused by the parents.
A court of appeal may not overturn a judgment of a juvenile court absent an error of law or a factual finding that is manifestly erroneous or clearly wrong. See Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 n. 2 (La.1993); see also State, In Interest of GA, 94-2227 (La.App. 1st Cir.7/27/95), 664 So.2d 106, 110. Pursuant to this standard, the two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the juvenile court; and 2) whether the record further establishes that the finding is not manifestly erroneous. See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart, 617 So.2d at 882; Moss v. State, 07-1686 (La.App. 1st Cir.8/8/08), 993 So.2d 687, 693, writ denied, 08-2166 (La.11/14/08), 996 So.2d 1092. Even though an appellate court may feel its own evaluations and inferences are as reasonable as the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
*583 In ruling on this matter, the juvenile court issued written reasons for judgment in which it provided very detailed findings of fact. Many of the facts upon which the court relied are stated above; however, the court also made the following findings:
The Court acknowledges that the parents have substantially complied with their [case plan]; however, the fact remains that the cause of this child’s serious, life-threatening injuries [is] unknown. In the February 12, 2010 Court Letter, OCS indicated that the parents have complied with all aspects of the [case plan], except for explaining how the child was injured and devising or articulating an explanation as to how they can keep the child safe should he be returned to their care. The [case plan] states, in pertinent part:
The parents will need to gain an understanding of the injuries that their child sustained. They will need to acknowledge that the injuries were non-accidental in nature and [that EJ] was the victim of physical abuse. They need to be able to verbalize how they are going to be able to protect him in the future from an injury such as he has suffered.
Frankly, most of the aspects of the [case plan], such as maintaining employment, providing support, etc., are insignificant. The child came into care for no other reason than these life-threatening injuries. By failing to explain how these injuries were inflicted and failing to provide OCS with a plan to ensure their child’s safety, the parents have not altered or modified in a significant way the behavior which served as a basis for the state’s removal of a child from the home. The Court simply does not believe that the parents in this matter do not know how this infant suffered broken ribs and chronic subdural hemato-mas that require medical intervention to this day. To return the child to these parents, who have failed to address the most important aspect of their [case plan], would not be in the child’s best interest as it would place the child at risk for further abuse.
In addition to the danger of exposing this child to further abuse, the Court is concerned that the child will not receive adequate medical care since the parents have minimized the extent of the child’s injuries to all parties. The physicians at Children’s Hospital have determined the 112injuries are not accidental. Both OCS and CASA have indicated that the parents appear to minimize the seriousness of the child’s life-threatening injuries and focus more on how well the child is doing in spite of them. Moreover, the licensed clinical social worker, Donna Hulsey, who [met] with [EF] and completed a report on February 15, 2010, stated:
[EF] denied that [EJ] needed a shunt or had any lasting injury. He said that his wife and step-son both had large heads. He said that [EJ] met all developmental milestones on time. [EF] seemed strongly against further medical treatment for [EJ’s] injury during my sessions with him.
Ms. Hulsey recommended that the child should not be returned home and should remain in State’s custody since it is not known who injured the baby.
Another licensed clinical social worker named Lisa Tadlock evaluated both parents and submitted reports date[d] May 1, 2009. In her report, Ms. Tadlock stated that due to the severity of the child’s injuries and lack of explanation as to how the injuries occurred, she could not recommend returning the child to his parents at that time. Both CASA and OCS recommend transferring legal *584 guardianship of the child to Mr. and Mrs. Boyd.
In their brief, the parents argue that “both parents have repeatedly demonstrated to the State and this Honorable Court their care and concern for their child by exploring every possible cause of this injury.” Absolutely no evidence of this has been presented to the Court and no further explanation was given in their brief.
[[Image here]]
The child is only 18 months old at this time and is still- unable to verbally communicate. Considering the threat of further abuse and the strong indication that the [parents] will continue to minimize the child’s medical needs, it is clear the child’s best interests are served by living outside his parents’ home.
For almost a year after EJ was taken into State custody, reunification with his parents was the permanent plan pursuant to his case plan. However, because OCS, CASA, and the various social workers providing services to the family were concerned about the parents’ inability or unwillingness to comply with the specified part of the case plan quoted above, OCS made a determination to change its recommendation of the permanent plan to permanent guardianship with the godparents.
Pursuant to LSA-Ch.C. art. 702(C)(1), in order for reunification to remain as the permanent plan for the child, the parents must be complying with the case plan and | ^making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. The parents contend that they were complying with them case plan, as was stipulated. However, as noted by the juvenile court, the parents failed to make any progress in complying with the single most important part of their case plan, namely, they failed to provide any explanation for the life-threatening injuries sustained by EJ, and they failed to provide OCS with a plan to ensure EJ’s safety if he were to be returned to them.
The parents rely on State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La.1993) for the proposition that a reasonable expectation of reformation exists when a parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been .eliminated. However, more than mere cooperation with agency authorities is required. More importantly, reformation of the parents is demonstrated by a significant, substantial' indication of reformation, such as altering or modifying in a significant way the behavior that served as a basis for the State’s removal of a child from the home. See State in the Interest of EG, 95-0018 (La.App. 1st Cir.6/23/95), 657 So.2d 1094, 1097, writ denied, 95-1865 (La.9/1/95), 658 So.2d 1263; see also State in Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 450-51. Since in this case, the juvenile court found that EJ was removed from his parents’ home for no other reason than because of the life-threatening injuries he sustained, and it is undisputed that the parents have made no progress in addressing that aspect of their case plan, it is clear there is no evidence that the parents have modified in a significant way the behavior that served as a basis for the State’s removal of the child from the home. Accordingly, there is no evidence of parental reformation in this matter.[18]
*585 The parents further contend that they have been deprived of their constitutional |14right to raise their child by the judgment of the juvenile court. Specifically, the parents rely on Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982), and Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640 (1981), for the proposition that a natural parent’s desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right. The parents further contend that if the juvenile court’s judgment is allowed to stand, they will be deprived of their constitutional right to raise their child, and the parent-child relationship between EJ and his parents will be permanently aborted, “without any evidence of harm to [EJ] being presented.”
As noted above, the record is filled with evidence of the harm that was inflicted upon EJ. The medical evidence is overwhelming that EJ suffered inflicted trauma consistent with child abuse, as evidenced by the bilateral subdural hemato-mas, brain contusions, subarachnoid hemorrhages, and broken ribs the doctors discovered during his ' examinations. Moreover, the evidence in the record is that EJ had been in the immediate care of his parents both times he had to be taken to the hospital for treatment. The parents themselves have offered no explanation for the injuries and have failed and refused to provide a plan to provide for EJ’s safety should he be returned to their custody. Furthermore, they have continued to minimize these injuries, despite the overwhelming evidence of their life-threatening nature.
It is true that a parent’s right to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law. State in the Interest of Three Minor Children, 558 So.2d 1238, 1243 (La.App. 1st Cir.1990). However, in addition to protecting the parents’ rights, the courts of this state are required to protect the child’s rights to thrive and survive. State, In Interest of GA, 664 So.2d at 114. Louisiana Children’s Code article 702(C) requires that the juvenile court determine the permanent plan that is the most appropriate and in the best interest of the child in accordance with certain priorities of placement. | ^Furthermore, LSA-Ch.C. art. 601, which addresses the purpose of the “Child in Need of Care” provisions, provides, in pertinent part, “[t]he health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title.”
We also note that despite the parents’ assertions in their brief to this court that their relationship with EJ has been severed by the juvenile court’s ruling, this is not the case. The juvenile court’s ruling did not terminate the parents’ parental rights; rather, it granted the Boyds legal guardianship of EJ. According to the judgment, this disposition shall remain in effect until the child’s eighteenth birthday, or until it is modified by the juvenile court. Therefore, the parents have the right to file a motion to modify the disposition if they so choose, a fact which they acknowledge in their brief to this court. More *586 over, the parents retain residual parental rights, including the right of visitation with EJ, pursuant to LSA-Ch.C. art. 116(24), which allow them to continue to maintain certain rights and responsibilities toward EJ.
Given the record, we find that there was a reasonable factual basis to support the juvenile court’s conclusion that EJ’s best interests would be better served by living outside his parents’ home, considering the threat of further abuse and the strong indication that the parents would continue to minimize EJ’s medical needs. We further find, based on our review of the record, that the factual determinations of the juvenile court were not manifestly erroneous.
DECREE
For the reasons set forth above, the judgment of the juvenile court granting the guardianship of EJ to Keith and Kendra Boyd and closing the case of the State of Louisiana through the Department of Social Services, Office of Community Services, without further court review, is affirmed. All costs of this appeal are assessed to the parents, EF and JF.
AFFIRMED.
HUGHES, J. concurs with reasons.

. The Slidell City Court exercises juvenile jurisdiction for its territorial jurisdiction pursuant to LSA-Ch.C. art. 302(4). As a court exercising juvenile jurisdiction, it has exclusive original jurisdiction in conformity with any special rules prescribed by law, over any child alleged to be in need of care and the parents of any such child. LSA-Ch.C. art. 604.

. The child and his parents are referred to by their initials to preserve their anonymity in this confidential proceeding. The minor child and his father share the same initials. The father goes by EF, Sr., and the minor child was referred to in the record as EF, EF, Jr., or EJ. For clarity, we will refer to the father as EF and the minor child as EJ.

. At various times in the record, the date of EJ’s first hospitalization is stated as December 10, 2008; however, Dr. Head’s report and the juvenile court’s written reasons for judgment use the date of December 8, 2008. We will use that date for consistency.

. JF has another young son from another relationship who lives in the house with her, EF, and EJ. EF also has a young daughter from another relationship who sometimes lives in the house with them.

. According to the Information provided by JF in Dr. Head’s report, if both parents were at work, the maternal grandmother would care for EJ. In testimony JF provided at a hearing in July 2009,’ she indicated that her sister and her grandmother also cared for him when she and EF were unavailable. EJ is not in daycare, however.

. He was also diagnosed with Respiratory Synctial Virus (RSV).

. Pursuant to LSA-Ch.C. art. 624, if a child is not released to the care of his parents, a continued custody hearing shall be held by the court within three days after the child’s *579 removal or entry into custody. In this matter, the continued custody hearing was originally scheduled for January 15, 2009; however the parties asked the juvenile court to open the hearing and then recess for a week.

. See LSA-Ch.C. arts. 626(B) and 603(23).

. Allegations that a child is in need of care must assert one or more of the enumerated grounds found in LSA-Ch.C. art. 606(A). The petition filed by the district attorney in this matter asserts neglect pursuant to LSA-Ch.C. art. 606(A)(2), but it also asserts an allegation similar to the ground of abuse found in Sub-paragraph (A)(1) of Article 606, which provides:
The child is the victim of abuse perpetrated, aided, or tolerated by the parent or
caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.

.Such a stipulation without admission is permitted pursuant to LSA-Ch.C. art. 647, as long as certain requirements are met. First, a pre-hearing conference must be convened in accordance with LSA-Ch.C. art. 646.1. Such a conference was apparently held between the juvenile judge, the assistant district attorney, and counsel for all other parties just prior to the hearing in this matter. In addition, LSA-Ch.C. art. 647(2) requires that the parents personally appear before the court. The *580 court must fully inform the parents of their rights, as well as the consequences of the stipulation, including their responsibility to comply with the case plan and correct the conditions requiring the child to be in care. LSA-Ch.C. art. 647(3) and (4). Finally, the parents must knowingly and voluntarily consent to the judgment. LSA-Ch.C. art. 647(5). All requirements appear to have been met in this case.

.The written judgment refers to the case plan as having been created on February 16, 2009; however, the written transcript of the hearing says the case plan was dated February 6, 2009. Furthermore, there is no case plan dated February 16, 2009. Therefore, it appears that the date in die judgment is a typographical error. In any event, a case plan dated June 30, 2010, was approved by the juvenile court on August 10, -2010. Accordingly, the February case plan was superseded by a subsequent case plan.

. At one point the case plan required EF to attend anger management courses; however, the juvenile court modified that portion of the plan at the six-month case review hearing in July 2009 to require EF to attend therapy to deal with certain issues surrounding abuse he may have suffered as a child.

. Other case plans had provided variations of the same statement.

. These hearings may be held simultaneously pursuant to LSA-Ch.C. art. 711.

. There is no mention of this in the minute entry for this date, nor is there a transcript of *582 this hearing in the record. However, in various other places in the record, as well as in the briefs on appeal it appears that the major disagreement between (he parties is the fact that the parents were unable or unwilling to give an explanation for how the injuries to EJ had occurred, nor were they able to provide any plan for his continued safety if he were returned to their care.

. If at any point during the child in need of care proceedings the child is removed from his parents' care and control and placed in the custody of the State, the child’s case is required to go through a series of case review and permanency plan review hearings until such time as the child achieves a permanent placement as defined by LSA-Ch.C. art. 603. See LSA-Ch.C. arts. 687 and 701. Pursuant to LSA-Ch.C. art. 603(20)(c), placement with a legal guardian is considered a permanent placement.

. We note that there is no notice of appeal in the record indicating that the attorney appointed to represent EJ appealed the judgment of the juvenile court. However, this court sent out a notice of abandonment to EJ’s counsel on July 26, 2010, and when no brief was received, the appeal was dismissed, as to EJ only, on August 13, 2010.

. The jurisprudence discussing reformation has been developed in the context of the approval or refusal to approve the termination of parental rights. However, in State in the Interest of S.M., 719 So.2d at 459 n. 8, the court applied the concept of reformation *585 while reviewing a juvenile court's judgment approving a permanency plan with a goal of reunification with the mother. While the matter currently before this court does not involve the termination of parental rights, it does involve the transfer of custody from the parents to a legal guardian, and therefore, at least involves the restriction of the parents’ rights to raise their child.