NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2025 CJ 0017

CHH
Pope
mut

STATE OF LOUISIANA IN THE INTEREST
OF C.S., Y.M., A.M., E.M., AND K.M.

Judgment Rendered: **SEP 1 7 2025**

* * * * *

On Appeal from the Thirty-Second Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
Case Number MSJ-6753 • Division A

Honorable Timothy C. Ellender, Jr., Judge Presiding

* * * * *

Jane C. Hogan
Hammond, Louisiana
-and-
Carmelita J. Ratna
Houma, Louisiana

Attorneys for Appellant,
M.D. (Minors' Mother)


Joseph L. Waitz, Jr.
*District Attorney*
Joseph S. Soignet
*Special Prosecutor*
Sarah N. Chouest
*Assistant District Attorney*
Houma, Louisiana

Attorneys for Appellee,
The State of Louisiana


Provanda Kennedy
Houma, Louisiana

Attorney for Plaintiffs-Appellees,
C.S., Y.M., A.M., E.M., and K.M.
(Minor Children)


Linda A. Mitchell
Thibodaux, Louisiana

Attorney for Plaintiff-Appellee,
Louisiana Department of Child and
Family Services


Jacques A. Beebe
Houma, Louisiana

Attorney for Appellee,
E.M. (Minors' Father)

* * * * *

BEFORE: THERIOT, HESTER, AND EDWARDS, JJ.

**HESTER, J.**

This children in need of care ("CINC") case is before us on appeal by the mother, M.D., from a judgment changing the goal in this case from reunification to adoption of the minor children, Y.M., A.M., E.M., and K.M. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

M.D. is the mother of the five children initially involved in this proceeding: C.S. born May 20, 2009; Y.M. born September 29, 2010; A.M. born May 1, 2012; E.M. born October 29, 2013; and K.M. born August 22, 2017. On October 20, 2022, the Louisiana Department of Children and Family Services ("DCFS") received reports of alleged neglect, including that C.S., a 13-year-old child, was the primary caretaker of the younger children while M.D. was away from the home, the house was in disrepair, the water service was cut off at the beginning of October 2022, and the children were not enrolled in school.

Rebecca James, a DCFS employee, responded to the home on October 21, 2022, and discovered that all of the children except Y.M. were home alone. While waiting for M.D. to arrive at the home, James spoke with C.S. C.S. informed James that neither she nor her sibling attend school because her mother could not afford clothes and shoes for them. C.S. indicated that the water service had been off for a few days, but M.D. purchased jugs of water for the children. C.S. further indicated that she cares for her siblings every time M.D. goes to work, which was typically from 10:00 a.m. to 8:00 p.m., and sometimes when M.D. has somewhere else to go. C.S. stated that she normally cooks for herself and her siblings, and assured James she likes to cook, so M.D. did not cook much.

After M.D. arrived, M.D. began to tell James that she takes care of her kids and provides food, further stating "there are b****es killing their kids and putting them into trash cans and y[']all are messing with me[.]" When questioned about the

2

schooling for the children, M.D. responded they had been out of school since COVID, which by that time was about three years. M.D. stated that the kids did homeschool but that it was online and not through the school system. M.D. could not provide a name of the online homeschool program and was evasive when answering follow up questions.

James was ultimately allowed into the home and observed dog feces on the floor in the hallway. The home, which had six dogs, smelled of dog, feces, and urine. James observed mold on the ceiling and pictures attached to the report showed roof damage and a hole in the ceiling of one of the rooms. James walked around outside the home and found no alternate source of water. Additionally, she observed bags of trash and broken furniture in the front yard of the home.

In light of the overall safety assessment, along with M.D.'s inability to provide proper care and supervision, proper childcare, and safe and stable housing, and the unknown whereabouts of the fathers of the children, James contacted Judge Ellender and requested an oral instanter order, which was granted. Upon being notified of the decision, M.D. told James "my kids aren't leaving with anyone[.]" The children were removed from the home.

On October 24, 2022, the trial court confirmed the oral instanter order, finding reasonable grounds existed to believe the children were in need of care in accordance with La. Ch. Code art. 606(A).[1] The trial court placed the children in provisional custody of the State of Louisiana, through DCFS (the "State"), pending the timely

---

[1] Louisiana Children's Code article 606(A) provides, in pertinent part, as follows:

Allegations that a child is in need of care shall assert one or more of the following grounds:

...

(2) The child is a victim of neglect.

(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.

3

filing of a CINC petition and adjudication. On October 26, 2022, the trial court held a 72-hour continued custody hearing at which counsel for the fathers entered general denials with no evidence presented. Counsel for M.D. denied the allegations and denied that the children were in need of care. The trial court found reasonable grounds existed to find the children in need of care and ordered that the children remain in the custody of the State pending further proceedings. On November 4, 2022, the trial court ordered that a Court Appointed Special Advocate ("CASA") be appointed to represent and advocate for the best interest of C.S., Y.M., A.M., E.M., and K.M.

Thereafter, the State filed a petition seeking adjudication of C.S., Y.M., A.M., E.M., and K.M. as children in need of care, alleging that the investigation conducted by James showed the allegations of neglect/lack of adequate supervision and neglect/lack of adequate shelter had merit and that the children's best interests would be served by maintaining their custody with the State. On December 14, 2022, the trial court conducted an appearance to answer hearing, at which time counsel for M.D. denied the allegations of the petition, denied that the children were in need of care, and objected to the appointment of CASA. Counsel for the fathers also entered general denials.

On January 17, 2023, the trial court conducted the adjudication and disposition hearing, at which time counsel for M.D. and the fathers reiterated their previous denials and objections and presented no evidence. The State introduced the January 9, 2023 DCFS report and attached medical records of the children as exhibits. The DCFS report indicated that M.D. made minimal renovations to the home and completed a mental health assessment, but she had not yet started parenting classes. The medical records showed all the children were obese and in need of a dental exam. A.M. had a noted diagnosis of ADHD, for which he took

4

two medications – Vyvnse and Guanfacine.[2]  All of the children were past due on recommended immunizations.  At the conclusion of the hearing, the children were adjudicated as children in need of care, and the trial court ordered that the children remain in the custody of the State.  Further, the trial court approved DCFS's case plan goal of reunification concurrent with adoption, and the parents were ordered to comply with the case plan and follow all recommendations therein.

At a case review hearing on April 26, 2023, the State requested that the children remain in the State's custody with the case plan goal of reunification concurrent with adoption and introduced the April 14, 2023 DCFS report and the April 10, 2023 CASA report as exhibits.  The DCFS report noted that M.D. had made substantial progress in her case plan: she obtained adequate housing in March 2023, but required two additional beds for the children; she began mental health treatment, attending an evaluation and two individual sessions,[3] but did not appear for her sessions in February and March or her medication management appointment in March[4]; she successfully completed a parenting class in January and had attended all meetings and court hearings regarding her case; and while she obtained full-time employment, she had not made any parental contributions.

While the CASA report acknowledged that M.D. was concerned about her children, the report also indicated that M.D. had not taken responsibility for any of the allegations against her except for the condition of her home.  M.D. had not demonstrated any behavioral changes.  Initially, M.D. was observed to be

---

[2] Subsequent medical records noted that Y.M. also took medication for his diagnosis of ADHD.

[3] M.D. reported that she had a history of anxiety and depression, having last received treatment six years prior after she and her husband separated.  She further reported that she entered into a new relationship three or four years ago, and her partner physically and emotionally abused her.  M.D. was diagnosed with major depressive disorder, generalized anxiety disorder, and problems related to housing and economic circumstances.  She was prescribed medication at that time.

[4] M.D. maintained that she was told that counseling and medication management was optional.

5

affectionate with the children during visits. However, on subsequent visits, M.D. did not provide parenting care to the children, often having the children provide for her while she sat. CASA volunteers also observed M.D. angry at times, yelling and using profanity. She had inappropriate conversations either with the children directly or in their presence, some of which conversations involved cursing and adult content.

The CASA report indicated that the children's initial foster mother, a fictive kin placement, reported fear of M.D.'s retaliation due to her communication with CASA and other parties in the case, noting that she witnessed the alleged abuse/neglect of the children. The foster mother reportedly obtained a restraining order against M.D.[5] The children were placed in the foster mother's home until they became uncontrollable, breaking windows, physically fighting, and "total chaos." Y.M. and A.M. were removed from the home partly due to concerns with the foster mother's older child's violent behavior/history. The CASA report noted that nine total children were living with the foster mother, who was a single parent working full-time.

The CASA report further indicated that there were significant educational gaps due to the children being out of school for approximately three years. Concerns regarding the children's heath were great, as their mental, physical, and dental health were neglected for several years. Y.M. was taken to the emergency room for chest pains in March 2023 and was previously diagnosed with obesity, constipation, and fatty liver. A.M. was also reported to be severely obese.

The CASA report indicated that counseling was needed for all the children. C.S. reported to CASA volunteers past abuse, neglect, and "several incidents," which reports were "confirmed by more than one individual [with] personal

_____

[5] A later DCFS report indicated that M.D. does not contact E.M. due to the restraining order that was put in place in May 2023.

knowledge of the family dynamics." Notably, C.S. expressed fear that M.D. would become angry and retaliate if she spoke to anyone; however, she requested to speak with the judge privately or without M.D. present.

Counsel for C.S. further noted her opposition to reunification with M.D., requested visitation with her siblings separate from M.D., requested that visitation begin with her father, and requested to remain in her current foster home. Ultimately, the trial court approved the case plan goal of reunification concurrent with adoption. Further, the trial court ordered that M.D. was not to visit the children unsupervised, unless the therapist recommended otherwise. The trial court authorized C.S. to visit with her father, provided there was no drinking, and ordered that DCFS arrange for visits for the children without the presence of M.D.

At the October 17, 2023 permanency hearing, counsel for C.S.'s father requested that custody be transferred to him and the case be closed as to her only. M.D. had no objection. Having heard the testimony of the father and a CASA advocate, and after reviewing the October 9, 2023 DCFS report, the trial court ordered that custody of C.S. be transferred to her father.[6] As to the remaining children, Y.M., A.M., E.M., and K.M., the trial court accepted DCFS's recommended case plan with the goal of adoption, finding it to be in the best interest of the children. At the time of this hearing, M.D. had relocated to Maine.[7]

Two more review hearings were held on April 24, 2024 and May 30, 2024, along with a status hearing on September 24, 2024, concerning Y.M., A.M., E.M., and K.M. At the April 24, 2024 hearing, the case plan of adoption was rejected, and

---

[6] A later CASA report dated April 24, 2024 noted that C.S. was no longer in State custody and guardianship was transferred to fictive kin.

[7] Included in the October 9, 2023 DCFS report is the lease M.D. signed for a rental property in Maine, with an initial rental period beginning on August 17, 2023. The DCFS report indicated that M.D. had made some progress on her case plan, obtaining adequate housing in Maine in June 2023. It was noted that her mental health treatment would need to be transferred to Maine. She continued to attend all her meetings and court hearings, but she had not paid any parental contributions.

DCFS was ordered to reevaluate the case plan. The April 18, 2024 CASA report entered into evidence noted that Y.M. tested positive for an STD antibody in August 2023, which was confirmed by a second test in October 2023. Y.M. was noted to have soiled his pants several times, made frequent sexual comments, and was obsessed with food. The CASA report also noted that M.D. rarely took care of the children's needs during the supervised visits with the children; rather, M.D.'s 20-year-old daughter acted as the caregiver (bringing K.M. to the bathroom, getting food, and supervising play), while M.D. acted more as a playmate.

At the May 30, 2024 hearing, the State requested that the case plan goal of reunification be accepted with the agreement of counsel for the children, while CASA recommended that the case plan goal be changed to adoption. The trial court reviewed the May 23, 2024 DCFS report entered into evidence, which indicated that M.D. was living in a three bedroom, one bathroom home in Maine. A case manager completed a virtual walk-through of the home and found it adequate and with adequate bedding for the children. The case manager requested the state of Maine to complete a parent home study. As of May 23, 2024, M.D. still had not paid any contributions ($10.00 per child, per month), but she was employed more than forty hours per week and paid $24.00 per hour. While the DCFS report made no mention of the STD antibody in relation to Y.M., the May 22, 2024 CASA report identified numerous primary concerns with the children, including (1) the uninvestigated STD of at least one of the children[8]; (2) the multiple uninvestigated abuse allegations reported to CASA by multiple sources; (3) the lack of counseling, especially for Y.M. and A.M.; (4) M.D.'s continued denial of the reasons the children went into State custody; and (5) the inability to supervise and corroborate facts while M.D. is in Maine. Most notable was CASA's concern with M.D.'s non-compliance with

---

[8] The prior CASA report noted that A.M. needed to be retested for STDs due to "insufficient specimen" after an August 2023 test.

court orders when C.S. resided in Maine with M.D. Following alleged physical abuse that occurred almost immediately after her arrival in Maine, C.S. was returned to her father's custody. While M.D. was ordered not to be around C.S., M.D. was listed as the guardian when C.S. was enrolled in school the following week. Guardianship of C.S. was ultimately granted to fictive kin.

At the conclusion of the May 30, 2024 hearing, the trial court ordered that all the children have a psycho-sexual evaluation and receive trauma therapy and group therapy. The trial court did not change the case plan goal to adoption at that time.

At the September 24, 2024 status hearing, A.M. requested to "speak to the Court[,]" which request was granted. After hearing additional statements and sworn testimony, the trial court issued a judgment ordering, in part, that A.M. was not allowed to have electronic devices; DCFS was to notify law enforcement of any possible criminal conduct involving Y.M. and A.M. within twenty-four hours; M.D., the mother, was not allowed any unsupervised communication with Y.M., A.M., E.M., and K.M.; and DCFS should follow through with all scheduled appointments and any recommendations for the children.

A permanency hearing was held on October 22, 2024. At that time, K.M. was in a foster home, A.M. was placed with fictive kin, E.M. was in a therapeutic foster care home, and Y.M. was placed at Harmony House. Two DCFS employees, two CASA advocates, and M.D. testified at the hearing, and the trial court accepted into evidence a DCFS report dated October 15, 2024, the case plan for A.M. and K.M., and a CASA report dated October 14, 2024.[9]

The DCFS report indicated that the Maine home study was completed and was not accepted. According to the Maine home study, M.D. indicated that she had

---

[9] The DCFS report indicated that A.M. had diagnoses of ADHD, oppositional defiant disorder, and anger reaction, for which he was prescribed multiple medications. He was referred to specialized services for the treatment of children with sexual behaviors, and the case manager reported A.M.'s sexualized behavior to law enforcement on September 24, 2024, along with Y.M.'s positive STD results.

assistance with childcare but had no specific plans outlined. It was noted that the two persons M.D. identified as helping her with childcare did not live close by and did not appear to be probable or practical full-time childcare options. M.D. had not resolved or planned to resolve the risk of leaving the children unattended for long periods of time. Further, M.D. did not appear to understand the behavioral and mental health needs of her children, minimizing their needs and blaming the children's behaviors on DCFS changing their medications.[10] She stated that the children were removed from her home because of "retaliation" by the case worker who had a personal conflict, and she generally blamed others for her behaviors and choices.[11] According to the home study, it was unlikely that health care, supervision, behavioral needs, or mental health needs would be provided in a timely manner with M.D. in the state of Maine.

Y.M., A.M., and E.M. were assessed by professionals at the Children's Advocacy Network Care Center on July 16, 2024. All of the children reported traumatic events and abuse and neglect in the home while living with M.D. While none of the children qualified for trauma-focused cognitive behavioral therapy, it was recommended that they receive treatment from licensed professionals with trauma training.

An October 14, 2024 CASA report reiterated prior concerns with M.D., while acknowledging that she has completed most of her case plan. Of particular concern was that M.D. refused to accept responsibility for the issues which caused the children to be removed from the home, ignored court orders regarding contact with her children, failed to provide a viable childcare plan in Maine, and failed to

---

[10] M.D. stated that she did not have to use discipline often and that the children listen to her because she is the mom.

[11] In fact, in an initial diagnostic assessment of M.D. prepared by a provider in Maine, which was included with the DCFS report introduced into evidence at a prior hearing, M.D. indicated that her children were taken into protective custody because her home was severely damaged during Hurricane Ida. Additionally, she continued to claim that her children were homeschooled.

contribute to the children's needs financially per the case plan. CASA recommended that the children remain in the State's custody and that the case plan goal be changed to adoption.

Ultimately, the trial court ordered that the permanent plan be changed to adoption, finding that it is the plan most likely to achieve stability for the children and that it was in the children's best interest, considering their health, safety, and welfare. The trial court further ordered as follows:

1. That all the children continue receiving individual mental health counseling services on a regular basis to address their mental health needs and trauma endured.

2. That all the children continue receiving extensive tutoring and/or educational services to help address educational gaps.

3. That [DCFS] investigate the allegations of physical abuse by [M.D.].

4. That all contact between [M.D.] and the children be supervised by [DCFS].

5. That all the children be tested for STD's [sic] (including HS[V] -2) due to allegations of possible sexual abuse.

6. That [Y.M.] be referred to a sexual abuse counseling center to receive counseling and guidance regarding his STD diagnosis.

7. That [A.M.] be referred to a sexual abuse counseling center to receive counseling regarding the alleged sexual assault, his pornography use, and his solicitation of men and women for sex.

8. That all children receive group therapy.

9. That [M.D.] complete a psychological evaluation and participate in trauma therapy.

M.D. appeals from this ruling, which was memorialized in a judgment dated October 30, 2024.

## LAW AND ANALYSIS

### Legal Precepts

Whenever custody of a child is assigned to DCFS as a child in need of care, there are two separate components of permanency planning: (1) the initial case plan (La. Ch. Code arts. 671 to 677 (Chapter 13)) and its review hearing process; and (2)

11

the identification of a permanent plan for the child and its review hearing process (La. Ch. Code arts. 701 to 711 (Chapter 16)).[12] **State in Interest of A.C.**, 2023-0825 (La. App. 1st Cir. 1/19/24), 2024 WL 206378, *6 (unpublished) (citing **State in Interest of C.M.**, 2017-0429 (La. App. 1st Cir. 5/31/17), 2017 WL 2384881 at *3 (unpublished)). This case review and dispositional review process continues until the child achieves the proposed permanent plan. **State in Interest of A.C.**, 2024 WL 206378 at *6. An assignment of legal custody to DCFS, regardless of the stage of the proceedings, confers to DCFS the exclusive authority to determine a particular placement of the child. La. Ch. Code art. 672, Official Comments, 2001; **State in Interest of A.C.**, 2024 WL 206378 at *6. However, the overall consideration for the welfare of the child is still the exclusive domain of the juvenile court judge. See **State in Interest of S.S.**, 499 So.2d 1198, 1201 (La. App. 5th Cir. 1986); see also La. Ch. Code arts. 619(C), 700(A), and 702(C).

Louisiana Children's Code article 700, which was intended to clarify the role of the court *vis-à-vis* the role of DCFS as set forth in La. Ch. Code art. 672 (see La. Ch. Code art. 700, Official Comments, 1991), provides, in part, as follows:

> A. At the conclusion of the case review hearing, the court shall make a finding as to whether the child can safely return to the custody of the parent and shall order return of custody to the parent if it is safe to do so. The court order shall give specific written reasons for the findings. If the court finds that the child cannot be safely returned to the parent under terms and conditions deemed to be in the best interest of the child, the court may take one of the following actions:
>
> (1) Approve the plan as consistent with the health, welfare, and safety of the child and order compliance by all parties.

---

[12] Louisiana Children's Code article 671 provides that if at any point in a CINC proceeding, a child enters the custody of a child care agency (defined by La. Ch. Code art. 603(7) as "any public or private agency exercising custody of a child"), the provisions of Chapter 13 as to permanency planning reports govern. Similarly, La. Ch. Code art. 687 provides that if at any point in CINC proceedings, the child is removed from his parents' care and control and placed in the custody of DCFS, the provisions of Chapter 15 as to dispositional reviews shall govern the subsequent review process until such time as the child achieves a permanent placement as defined in La. Ch. Code art. 603(22). The provisions of Chapter 16 are also applicable to the review process. La. Ch. Code art. 701.

(2) Find that the case plan is not appropriate, in whole or in part, based on the evidence presented at the contradictory hearing, and order [DCFS] to revise the case plan accordingly.

The court shall determine the permanent plan for the child that is "most appropriate and in the best interest of the child[.]" La. Ch. Code art. 702(C). However, La. Ch. Code art. 702(C) specifies the priority of placement, in part, as follows:

(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. *In order for reunification to remain as the permanent plan for the child, the parent shall be in compliance with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.*

(2) Adoption.

(3) Placement with a legal guardian.

(4) Placement in the legal custody of a suitable relative who is willing and able to offer a stable and safe home for the child.

(Emphasis added.) In most permanent plan determinations, the court is required to determine whether DCFS has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health, welfare, and safety are the paramount concerns in the court's determination of the permanent plan. La. Ch. Code art. 702(E). More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. **State in Interest of M.N.**, 2023-0174 (La. App. 1st Cir. 6/23/23), 370 So.3d 744, 749, writ denied, 2023-00947 (La. 9/6/23), 369 So.3d 1269 (citing **State in Interest of K.P.**, 51,853 (La. App. 2d Cir. 11/15/17), 246 So.3d 627, 634).

Importantly, in order for reunification to remain the permanent plan for the child, the parent must be (1) complying with the case plan; (2) making significant measurable progress toward achieving its goals; and (3) correcting the conditions requiring the child to be in care. See La. Ch. Code art. 702(C)(1); **State in Interest of M.N.**, 370 So.3d at 749. Mere cooperation by a parent is not the sole focus of the

13

evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody. **State in Interest of M.N.**, 370 So.3d at 749 (citing **State in Interest of N.L.**, 54,429 (La. App. 2d Cir. 3/30/22), 335 So.3d 1018, 1023).

An appellate court's review of a juvenile court's determination of a permanent plan is governed by the manifest error standard. An appellate court may not overturn a judgment of a juvenile court absent an error of law or a factual finding that is manifestly erroneous or clearly wrong. **State in the Interest of E.F., Jr.**, 2010-1185 (La. App. 1st Cir. 10/29/10), 49 So.3d 575, 582. The two-part test for the appellate review of a factual finding is: (1) whether there is a reasonable factual basis in the record for the finding of the juvenile court; and (2) whether the record further establishes that the finding is not manifestly erroneous. **Id.** (citing **Mart v. Hill**, 505 So.2d 1120, 1127 (La. 1987)).

The appellate court must not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. **State in the Interest of C.M.**, 2017 WL 2384881 at *4 (citing **State in the Interest of T.B.**, 2016-215 (La. App. 5th Cir. 9/22/16), 202 So.3d 555, 560). Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. See **State in the Interest of E.F., Jr.**, 49 So.3d at 582. If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. **State in the Interest of T.B.**, 202 So.3d at 560-61.

<u>Issue Presented for Review</u>

On appeal, M.D. contends that the trial court erroneously changed the case plan goal to adoption. M.D. argues that the trial court failed to recognize her significant, measurable progress and compliance with her case plan. Notwithstanding M.D.'s arguments, the trial court concluded in its reasons for judgment that M.D. "did not comply with the case plan by failing to make significant measurable progress toward achieving its goals and correcting the conditions that originally placed the children in the State's care."

In addition to finding a lack of substantial compliance with the case plan, the trial court determined that M.D. failed to show improvement by altering or modifying in a significant way the behavior that served as a basis for the State's removal of the children from her home. See **State in Interest of S.M.**, 98-0922 (La. 10/20/98), 719 So.2d 445, 451. In support of its ruling, the trial court made the following factual findings:

> The children were taken into custody on October 21, 2022. At the time of the permanency hearing, the children had been in custody with [DCFS] for over two years. Although the children were originally taken into custody due to lack of adequate shelter, supervision[,] and neglect, subsequent discoveries regarding the children's well-being and health surfaced. Specifically, new grounds of past sexual and physical abuse were brought to light, specifically, at least one of the minors has tested positive twice for STD antibodies. Additionally, the children's physical health is of significant concern. Each of the children's BMI are at the 99[th] percentile.
>
> In addition to concerns surrounding the children's wellbeing, [M.D.] has repeatedly defied court orders including contacting the children outside of the court sanctioned modes and failing to make parental contributions. From the onset of the case, [M.D.] has been ordered to financially contribute to her children's needs. Up until the last hearing, she had not made any significant contribution. Since then she sent cash directly to the children in lieu of providing it to [DCFS]. This is emblematic of the one many ways [M.D.] repeatedly demonstrates unwillingness to work with [DCFS] and further avoids accepting any responsibility for her children's past and present mental and physical health. The Court characterizes the open defiance as selfish and in complete opposition to her trying to reunite with her children.

Lastly, [M.D.] resides and is employed in Maine. Although gainful employment is a component of her case plan, her present residence makes it impractical for her to conduct regular visitations with her children. Even though [DCFS] tried to implement an Interstate Compact on Placement of Children, Maine's Office of Child and Family Services declined to assist with transitioning supervision of the children to Maine. Her relocation to Maine has only hindered her ability to work her case plan evidenced by the fact that the children remain in State's custody.

As defined to La. Ch. C[ode] [a]rt. 601, the purpose of these proceedings is to protect children, and these efforts are to be "conducted expeditiously to avoid delays in achieving permanency for children." The Court considered the litany of evidence put forth by all parties and determined that to uphold the statutory purpose and consider the best interest of the children, that after two years of uncertainty, it must order that the permanent case plan goal be changed to adoption in efforts to work towards any sort of permanency for these children.

After a thorough review of the record, the testimony at the October 22, 2024 hearing, and the evidence introduced, we find a reasonable factual basis exists in the record supporting the trial court's findings. See **Mart**, 505 So.2d at 1127; **State in the Interest of E.F., Jr.**, 49 So.3d at 582.

M.D. further argues that because the children are not in currently in adoptive placements and are in separate placements across the state, the change of the plan to adoption was erroneous because it is not a realistic placement for the children. While these factors can be considered by the court, the paramount concern in the court's determination of the permanent plan is the children's health, welfare, and safety. See La. Ch. Code art. 702(E). Moreover, pursuant to La. Ch. Code art. 702(C)(1), "[i]n order for reunification to remain as the permanent plan for the child, the parent shall be in compliance with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care." The very clear reasons of the trial court establish that M.D. was not in compliance with the case plan and there were significant concerns regarding M.D.'s behavior, which had not shown improvement.

Accordingly, reunification could not remain the permanent plan for the children in light of the children's ages and need for a safe and permanent home. The trial court noted that the children had been in the State's care for more than two years. Under La. Ch. Code art. 702(C), the next placement option was adoption. Thus, the trial court correctly applied the plain language of La. Ch. Code art. 702(C) and changed the case plan goal to adoption. Therefore, in considering the health, welfare, and safety of the children, we are unable to conclude that the trial court's ruling was manifestly erroneous. See **State in the Interest of E.F., Jr.**, 49 So.3d at 582.

## CONCLUSION

For the above and forgoing reasons, we affirm the trial court's October 30, 2024 judgment ordering the permanent plan be changed to adoption. All costs associated with this appeal are assessed to appellant, M.D.

**AFFIRMED.**